Richard S. KEOSEIAN, Plaintiff,

v.

Hedda Schoonderbeek VON KAULBACH, Mayen Beckmann Wuerdig, Peter Beckmann, and "Anne Doe" and "Richard Roe" as Executors of the Estate of Mathilde Beckmann, Defendants.

No. 88 Civ. 1544 (MBM).

United States District Court,
S.D. New York.

March 2, 1989.

Adolph D. Seltzer, New York City, for plaintiff.

Edward J. Ross, Breed, Abbott & Morgan, Hedda Schoonderbeek Von Kaulbach, New York City, for defendants.

AMENDED OPINION AND ORDER

MUKASEY, District Judge.

Plaintiff Richard S. Keoseian claims that defendant Hedda Schoonderbeek von Kaulbach, older sister of the widow of German Expressionist painter Max Beckmann, assigned to him in August 1987 one of Beckmann's paintings, "Portrait of Quappi," which had been given to her by her sister, Mathilde Beckmann, nicknamed "Quappi," the subject of the painting. He seeks a declaratory judgment that the assignment is valid and enforceable and requests that the executors deliver the painting to him rather than to von Kaulbach. Although defendant admits that she executed the assignment, she claims, *inter alia*, that her signature was procured through fraud, duress, undue influence and misrepresentation as to the contents and meaning of the document.

Plaintiff now moves to disqualify von Kaulbach's counsel, Edward J. Ross and Breed, Abbott & Morgan, claiming that they previously represented plaintiff on a matter substantially related to the present litigation and thus have a conflict of interest. Alternatively, plaintiff asserts that Ross and other partners of Breed, Abbott are witnesses who ought to be called to testify at trial, and that they must therefore be disqualified. For the reasons set forth below, plaintiff's motion is denied.

Plaintiff claims that Breed, Abbott represented him as well as von Kaulbach when she litigated the validity of Quappi's 1982 will in which Quappi had named two paid companions, the Robinsons, as beneficiaries, leaving von Kaulbach with only $5000. At the time of Quappi's death on March 30, 1986, von Kaulbach was living in Germany and knew no one in New York. (Ross Aff. at ¶ 11) Plaintiff, von Kaulbach's neighbor when she lived in New York, offered to help her secure legal counsel. By letter dated May 10, 1986, von Kaulbach authorized plaintiff to do "whatever is necessary to effectuate what prospects there are to overturn the trust and/or the will (dated 1982) from my late sister Mathilde A. Beckmann." (Keoseian Aff., Exh. B) Plaintiff and the executors

of Quappi's earlier 1975 will, Frederic P. Houston and Perry Rathbone, contacted Ross. After some discussions, Breed, Abbott and Rathbone, Houston, Keoseian on behalf of von Kaulbach, and Keoseian individually entered into a retainer agreement. (Keoseian Aff. at ¶ 9)

Breed, Abbott duly filed various lawsuits challenging the 1982 will. Plaintiff claims that he substantially assisted the Breed, Abbott lawyers. (Keoseian Aff. at ¶ 11) On July 15, 1987, a settlement was reached whereby the Robinson sisters relinquished their claims to the estate in exchange for a "modest" sum. (Ross Aff. at ¶¶ 17–19; Keoseian Aff. at ¶ 17)

Plaintiff claims that, from the moment the retainer agreement was signed, "I believed that Ross and Breed were my attorneys. I still do." (Keoseian Aff. at ¶ 10) He thus asserts that Ross is disqualified from representing von Kaulbach in this action. Plaintiff claims also that Ross is a material witness in that Ross can testify to von Kaulbach's state of mind at the time she signed the assignment. He claims Ross can also testify to the extent of Keoseian's assistance to von Kaulbach in the earlier litigation and thus establish consideration for von Kaulbach's assignment of the portrait to plaintiff.

### A. *Conflict of Interest*

█ Plaintiff asserts that Ross, as his former lawyer, has gained knowledge of confidential matters, thus putting von Kaulbach at an unfair advantage in this litigation. In this Circuit, such disqualification motions are viewed with disfavor because they "are often interposed for tactical reasons" and lead to delay. *Board of Educ. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir.1979). Thus, movant must demonstrate that there is a "real risk that the trial will be tainted." *United States Football League v. National Football League*, 605 F.Supp. 1448, 1452 (S.D.N.Y.1985) (collecting cases).

An attorney may be disqualified from representing a client under Canon 4 of the ABA Code of Professional Responsibility (1970) in a particular case if:

(1) the moving party is a former client of the adverse party's counsel;

(2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit;

(3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

*Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir.1983). In a situation such as this, where the earlier litigation was a joint effort by plaintiff, von Kaulbach, Rathbone and Houston, in which plaintiff acted as an agent for von Kaulbach at all times, the Second Circuit adds a fourth requirement: the movant must show that he reasonably expected that any information he imparted to counsel would not have been revealed to his former ally during the prior representation. *See Allegaert v. Perot*, 565 F.2d 246 (2d Cir.1977); *United States Football League*, 605 F.Supp. at 1452 n. 7.

Ross challenges the applicability of each factor. First, he asserts that Keoseian was not his client because, although Keoseian signed the retainer letter, that document explicitly stated that "Keoseian [has] no financial interest in the litigation." (Keoseian Aff., Exh. B at 2) Moreover, Keoseian never paid anything toward the costs of litigation. (Ross Aff. at ¶ 23(2)) Finally, Keoseian was never asked to sign the proposed settlement. (Ross Aff. at ¶ 23(5)) Only once was Keoseian actually represented by Ross's firm—when the Robinson sisters noticed Keoseian's deposition. (Ross Aff. at ¶ 23(6)) Ross explains that "[w]e willingly did this, not because we deemed ourselves to be his attorneys, but to prevent his hurting our case" (*Id.*), and that Keoseian admitted at the deposition that he was represented free of charge. Ross also notes that he would not allow Keoseian to attend an important conference with Houston and Rathbone for fear that Keoseian's attendance would destroy the attorney-client privilege as Ross believed he was not

representing Keoseian. (Ross Aff. at ¶ 23(7))

Ross explains that he had Keoseian sign the retainer letter because Keoseian was planning to set up a Max Beckmann Foundation to display the estate's artwork for the general public, and Ross wanted Breed, Abbott retained as counsel to the Foundation. (Ross Aff. at ¶ 23(9)) Accordingly, the retainer agreement contained a provision to that effect. Ross also wanted the retainer letter signed by Keoseian to bind him personally for the firm's litigation fee.

Courts have developed a fairly broad test for whether an attorney-client relationship has formed, rejecting the argument that indicia of a formal relationship are necessary. *Westinghouse Elec. Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311 (7th Cir.), *cert. denied*, 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed. 2d 346 (1978). Thus, "an attorney client relationship is said to exist when the party divulging confidences and secrets to an attorney believes that he is approaching the attorney in a professional capacity with the intent to secure legal advice." *Trinity Ambulance Serv., Inc. v. G & L Ambulance Servs., Inc.*, 578 F.Supp. 1280, 1283 (D.Conn.1984).

In every situation where an attorney-client relationship has been found, however, the client's belief has some reasonable basis in fact in that he has some interest of his own or in common with others which he is seeking to advance by securing legal advice. *See, e.g., Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746 (2d Cir.1981) (finding members of an association clients of the association's lawyers where members met with association lawyers to discuss labor matters); *Westinghouse Elec. Corp.*, 580 F.2d at 1318–20 (same); *State Farm Mut. Auto. Ins. Co. v. Walker*, 382 F.2d 548 (7th Cir.1967) (lawyer representing insurer against third-party claim found also to be lawyer for insured because of common interest as demonstrated in cooperation clause in insurance contract), *cert. denied*, 389 U.S. 1045, 88 S.Ct. 789, 19 L.Ed.2d 837 (1968); *Nemours Found. v. Gilbane, Aetna, Federal Ins. Co.*, 632 F.Supp. 418, 423–24 (D.Del.1986)

(finding that co-defendant was client of other defendant's counsel because of common interest in defending lawsuit); *Trinity Ambulance Serv.*, 578 F.Supp. at 1285 (finding attorney-client relationship between co-plaintiff and counsel for other co-plaintiff because of common interest in advancing litigation). Otherwise, a lawyer could find himself disqualified from handling litigation between his client and his client's friends or business associates if those acquaintances assisted in any way an earlier litigation involving his client. Here, Keoseian concedes that he had no financial interest in the prior litigation. (Keoseian Aff. at p. 29 ("This is the only allegations made by Ross ... that is accurate and true.")) The only interest at stake was his hope that, if the litigation was successful, von Kaulbach would set up a Foundation and hire Keoseian as its Executive Director.

Were it not for the fact that the retainer agreement was signed by Keoseian, this pipe dream would be insufficient to constitute an interest such that he could be considered a client of Ross's. His signature and the clause in the agreement mentioning the formation of the Foundation demonstrate, however, that the Foundation was more than just the stuff of dreams and, accordingly, that Keoseian had an interest in common with von Kaulbach and the others to advance the prior litigation. Moreover, although indicia of a formal relationship, such as a signed retainer agreement and payment of attorney's fees, are not necessary, and courts have found that a person might not be a client even though he was paying counsel's fees, *see, e.g., Westinghouse Elec. Corp.*, 580 F.2d at 1317 & n. 6; *International Paper Co. v. Lloyd Mfg Co.*, 555 F.Supp. 125, 132 (N.D. Ill.1982), defendant has found no case, nor has this Court, where a person who signed a retainer agreement was nevertheless found not to be a client. Although the retainer agreement certainly contained other language showing that plaintiff in fact had no financial interest in the litigation, the circumstances of Keoseian's relationship with Ross—signing the retainer agreement and laying the groundwork for the

Foundation—show that plaintiff had a reasonable basis in believing that Ross was acting as his lawyer. *Trinity Ambulance Serv.*, 578 F.Supp. at 1283.

Even so, I find that the prior litigation is not substantially related to this one. The only overlap of facts and issues between the two litigations involves the extent of Keoseian's services rendered in the first litigation. That issue, however, is one of little import because defendant never asserts the lack of consideration for the assignment; rather, she claims that Keoseian procured her signature through fraud, duress, undue influence and misrepresentation. Thus, the only overlap would be if one of the alleged misrepresentations Keoseian made to von Kaulbach was that he had performed services which, in fact, he had not done. Otherwise, I agree with Ross's characterization that the only parallel between the facts and issues in both litigations is that "in both situations, a younger person moved in with an elderly and infirm person and caused her to sign documents making substantial gifts to the younger person, through fraud, misrepresentation and duress, availing themselves of the known fact that elderly people, regardless of mental competence, lack the fortitude and energy to resist pressure." (Ross Aff. at ¶ 34) The relationship between issues in the prior and present cases is by no means "patently clear," "identical" or "essentially the same." *Government of India v. Cook*, 569 F.2d 737, 739–40 (2d Cir.1978).

Moreover, because Keoseian's interest was von Kaulbach's—in other words, if von Kaulbach succeeded, Keoseian would succeed—plaintiff must meet the fourth requirement of *Allegaert:* namely, that he reasonably expected that any information he imparted to counsel would not be revealed to von Kaulbach in the course of the prior representation. *United States Football League*, 605 F.Supp. at 1452 n. 7 ("This element becomes an issue especially in cases where a partnership, joint venture or other cooperative effort breaks up, or where two former co-parties to a litigation later sue each other.") The confidences which Keoseian claims he told Ross all concern matters crucial to von Kaulbach's claims such that Keoseian must have expected that Ross would divulge the information to von Kaulbach. Thus, confidences regarding Keoseian's personal relationship with Quappi and with the Beckmanns (Keoseian Aff. at ¶ 13), to the extent they were confidential,[1] were obviously disclosed with the intention of advancing von Kaulbach's claims in the prior litigation such that Keoseian could not expect that Ross would hide this information from von Kaulbach. Other confidences regarding Keoseian's personal life and business secrets as an estate broker, to the extent that they were relevant,[2] were divulged so that Breed, Abbott could defend Keoseian properly at his deposition and were thus disclosed to advance von Kaulbach's litigation such that, again, Keoseian could not reasonably expect that von Kaulbach would not be told about them. In sum, Keoseian divulged nothing that he would not expect Ross to tell von Kaulbach. Indeed, it is difficult to imagine a situation where secrets would necessarily be kept from others in a cooperative effort of this sort, leading Judge Leisure to note that the *Allegaert* rule usually means that "such motions must fail." *United States Football League*, 605 F.Supp. at 1452 at n. 7.

In sum, no conflict of interest exists because Ross represented plaintiff in the prior matter.[3]

---

**1.** Keoseian also claims that he disclosed his personal relationship with von Kaulbach. Obviously, von Kaulbach knew the details of her relationship with him, so nothing confidential was revealed.

**2.** Most of Keoseian's claimed disclosures—his childhood stuttering problem, the effect of his mother's death, and his girlfriend—would be irrelevant in any action.

**3.** Plaintiff also moved under Canon 9, which provides that attorneys "should avoid even the appearance of professional impropriety." ABA Code of Professional Responsibility Canon 9 (1970). For the reasons enumerated above and also in light of the Second Circuit's warning that courts should be "quite hesitant" to disqualify attorneys solely on Canon 9 grounds, *Armstrong v. McAlpin*, 625 F.2d 433, 444–46 (2d Cir.1980) (*en banc*) (quoting *Nyquist*, 590 F.2d 1241, 1246

### B. *Lawyer as Witness*

■ Plaintiff claims that Ross's testimony is required by von Kaulbach in order to show her reduced mental and physical state at the time Keoseian induced her to sign the assignment. Plaintiff also claims that he will call Ross to show the extent of his services rendered for von Kaulbach and thus the consideration behind the assignment of the painting.

All the concerns militating against disqualification apply equally here. *See generally S & S Hotel Ventures Ltd. Partnership v. 777 S.H. Corp.,* 69 N.Y.2d 437, 443, 508 N.E.2d 647, 649–50, 515 N.Y.S.2d 735, 738 (1987). Indeed, if anything, they apply with more force because many of the reasons advanced to support the ban against an advocate appearing as a witness have nothing to do with protecting the client or the adversary from harm, but rather with protecting the legal profession as a whole from the "unseemly" public image it engenders. *S & S Hotel Ventures Ltd. Partnership,* 508 N.E.2d at 649–51, 515 N.Y.S.2d at 738–739. Moreover, as this matter will not come before a jury, there is no fear, justly invoked where a jury is involved, that the appearance of a lawyer as a witness will confuse lay people. *MacArthur v. Bank of New York,* 524 F.Supp. 1205, 1208 (S.D.N.Y.1981); *Eurocom, S.A. v. Mahoney, Cohen & Co.,* 522 F.Supp. 1179, 1180 (S.D.N.Y.1981).

The test for disqualifying counsel is whether counsel "ought to be called" as a witness, ABA Code of Professional Responsibility, DR 5–102(a); thus, the mere fact that other witnesses are available, without more, does not satisfy the Code's requirements. *MacArthur,* 524 F.Supp. at 1208. Disqualification, however, is required only when it is likely that the testimony to be given by the witness is necessary to one side's case. *J.P. Foley & Co. v. Vanderbilt,* 523 F.2d 1357, 1359 (2d Cir.1975). As the New York Court of Appeals has recently noted, "[t]estimony may be relevant and even highly useful but still not strictly necessary. A finding of necessity takes into account such factors as the significance of

the matters, weight of the testimony, and availability of other evidence." *S & S Hotel Ventures,* 508 N.E.2d at 651, 515 N.Y.S.2d at 739.

Ross disputes the contention that he will be called to testify about von Kaulbach's health, noting that the relevant inquiry is her health at the time she signed the assignment and that he was not in Germany at that time. I agree. Dr. Peter Beckmann, as well as others, were present then and can attest to her condition. Thus, Ross's testimony is not relevant to von Kaulbach's case.

The value of Keoseian's services, as I have indicated earlier, is a question of marginal importance to this lawsuit. Von Kaulbach does not contest that Keoseian rendered service on her behalf; rather, she claims that her signature was procured through fraud, duress, undue influence, and misrepresentation. The only way the issue could become relevant is if it turns out that Keoseian misrepresented to von Kaulbach the services he rendered in connection with the prior litigation and, in that way, induced her to sign the assignment. The relevance of this testimony is minor compared with issues in other situations where courts have ordered disqualification. *See, e.g., Two's Co. v. Transamerica Ins. Co.,* 653 F.Supp. 255, 258 (S.D.N.Y.1986) (insured's lawyer intimately involved in claim over whether payment made by insured's employee to him was for attorney fees or was restitution for insured's agreement not to prosecute employee; if payment was restitution, plaintiff's insurance claim against defendant would be barred); *MacArthur,* 524 F.Supp. at 1206 & n. 1 (defendant's lawyer heavily involved in many of the contested events regarding negotiation of joint venture); *Eurocom, S.A.,* 522 F.Supp. at 1180 (plaintiff's lawyer had earlier represented company whose sale of stock was subject of plaintiff's lawsuit; allegations made by defendant accounting firm that plaintiff's lawyer was involved in misrepresentations required disqualification). Also, documentary evidence in the form of Breed, Abbott's time sheets and the testimony of Houston and Rath-

(2d Cir.1979)), *vacated and remanded on other grounds,* 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d

835 (1981), I find that disqualification would be inappropriate under that Canon as well.

bone should suffice. Because the issue is relatively insignificant and other evidence is fully available, I find that Ross is not a witness who ought to be called such that disqualification is mandatory.

Even were I to find that Ross's testimony was necessary on the question of Keoseian's services, however, DR 5–102 allows an attorney-witness to continue representing his client if "disqualification would work a substantial hardship on the client." ABA Code of Professional Responsibility, DR 5–102 (1970). Apart from this exception, considerations of equity and fairness also warrant allowing Ross to continue representing defendant. Judge Gurfein has warned that the Code provisions should not be applied mechanically as if they were controlling statutes: "When we agree that the Code applies in an equitable manner to a matter before us, we should not hesitate to enforce it with vigor. When we find an area of uncertainty, however, we must use our judicial process to make our own decision in the interests of justice to all concerned." *J.P. Foley & Co.*, 523 F.2d at 1360 (Gurfein J., concurring).

Von Kaulbach's predicament is a classic example of hardship that mandates allowing her to retain Ross as her attorney. Von Kaulbach is near 90 and lives in Germany, far from this forum. Keoseian himself recounts how, in desperation, she turned to him, a former neighbor, to help her find legal counsel in 1986 when she first discovered that the Robinson sisters had induced Quappi to sign a new will. Obviously, von Kaulbach is in no better position now to contact lawyers in New York and provide them with all the information regarding the tortured history of the litigation over the Beckmann estate. Moreover, Ross has assisted her over the

last two and a half years and is thus well-acquainted with the complex facts and nuances of her legal situation. *See SMI Indus. Canada Ltd. v. Caelter Indus.*, 586 F.Supp. 808, 817 (N.D.N.Y.1984). Finally, although this case is not quite at the trial stage, it was removed from state court and one motion already has been denied. It is thus sufficiently advanced so that a change of lawyers would unfairly disadvantage von Kaulbach. In sum, I find that Ross is not a necessary witness for this litigation and that, even if he were, von Kaulbach would be substantially harmed by having to find a replacement such that the exception in DR 5–102 applies.

Accordingly, plaintiff's motion is denied.[4]

SO ORDERED.

---

4. Defendant also moves for Rule 11 sanctions. As my discussion indicates, although plaintiff's position regarding sanctions was not strong, neither was it so weak that "a competent attorney could not form a reasonable belief that the [motion] is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law." *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 254 (2d Cir.1985), *cert. denied*, ––– U.S. –––, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). In particular, the fact that plaintiff

signed the retainer agreement in the previous litigation demonstrates that this motion had some basis in fact and law. Defendant has perhaps stronger reason for questioning whether this motion was filed as a delaying tactic. I should note, however, that both parties have been guilty as far as delay is concerned. In particular, defendant, from her papers, is apparently considering filing a *forum non conveniens* motion. Defendant's motion for Rule 11 sanctions is denied.