UNITED STATES of America, Plaintiff,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, et al., Defendants.

No. 88 CIV. 4486 (DNE).

United States District Court,
S.D. New York.

Nov. 28, 1990.

Charles Carberry, Investigations Officer, New York City (Robert W. Gaffey, of counsel), for the State.

Michael B. Pollack, New York City, pro se.

MEMORANDUM & ORDER

EDELSTEIN, District Judge:

This opinion emanates from the voluntary settlement in the action commenced by the plaintiff United States of America (the "Government") against the defendants International Brotherhood of Teamsters (the "IBT") and the IBT's General Executive Board (the "GEB") embodied in the voluntary consent order entered March 14, 1989 (the "Consent Decree"). The remedial provisions in the Consent Decree provided for three Court-appointed officials, the Inde-

pendent Administrator to oversee the remedial provisions, an Investigations Officer to bring charges against corrupt IBT members, and an Election Officer to oversee the electoral process leading up to and including the 1991 election for International Officers (collectively, the "Court Officers"). The goal of the Consent Decree is to rid the IBT of the hideous influence of organized crime through the election and prosecution provisions.

The instant matter is an application from the Investigations Officer to take the sworn in-person examination of an agent of the IBT pursuant to ¶ F.12.(C)(i)(d) of the Consent Decree. Paragraph F.12.(C)(i)(d) requires that the Investigations Officer demonstrate by affidavit cause to this Court for such an examination. In this instance, the Investigations Officer seeks approval to take the sworn, in-person statement of Michael Pollack, Esq. as part of an investigation into the propriety of IBT Local 295 paying certain legal fees of Anthony Calagna. For reasons to be discussed, the Court finds the Investigations Officer has demonstrated cause for this examination, and his application is granted.

## I. Background

The affidavit submitted by the Investigations Officer establishes the relevant facts.

Anthony Calagna is the president of IBT Local 295, located in Queens, New York. Local 295 is primarily composed of IBT members who work at John F. Kennedy International Airport in Queens, New York. On or about May, 1989, Calagna was indicted in the United States District Court for the Eastern District of New York on charges of extorting monies from employers of members of Local 295 (the "criminal action"). On or about March, 1990, Calagna and other officers of Local 295 were named as defendants in a civil RICO action brought by the Government in the United States District Court for the Eastern District of New York against Local 295, IBT Local 851, and certain present and former officers of those locals (the "civil action"). The civil action alleges, among other things, that Calagna is a member of the

Lucchese family of La Cosa Nostra, and that he participated in a pattern of extortion from employers of members of Locals 295 and 851.

The Investigations Officer conducted an investigation into Local 295. In the course of that investigation, the Investigations Officer examined the books and records of Local 295. Those documents revealed that the executive board of Local 295 (the "executive board") held a meeting on May, 16, 1989—approximately one week after Calagna's indictment—the minutes of which were submitted as Exhibit B to the instant application (the "minutes"). At that meeting, the executive board voted to award Calagna a $600 per week salary increase retroactive to May 15, 1988. In addition, the minutes state that Calagna's counsel Pollack rendered his opinion to the executive board that Calagna's pending criminal charges were "a union matter" and that his legal fees could be paid by Local 295. The minutes indicate that the executive board unanimously agreed with Pollack's opinion. On May 31, 1989, the executive board entered into a retainer agreement with Pollack (the "retainer agreement"). The retainer agreement called for Local 295 to pay Pollack $50,000 immediately, $50,000 when the trial begins, and if the trial exceeds six weeks, $10,000 per week for the next five weeks with a fee cap of $150,000. Exhibit C. On June 2, 1989, Local 295 made out a check for $50,000 payable to Pollack. Exhibit C.

On January 11, 1990, the Investigations Officer served Calagna with a notice of sworn statement pursuant to ¶ F.12.(C) of the Consent Decree. Calagna refused to appear for such examination, and on May 7, 1990, this Court entered an order directing Calagna to appear and give a sworn statement. On May 11, 1990, Calagna appeared for his statement represented by Ira Drogin, counsel for Local 295, and Pollack. When giving his sworn statement, Calagna invoked his fifth amendment privilege against self-incrimination on all questions concerning the criminal action, the civil action, his involvement with organized crime, and Local 295's payment of his legal fees.

On July 30, 1990, the Investigations Officer filed disciplinary charges against Calagna. "The Investigations Officer charged Calagna with acting in a manner to bring reproach upon the IBT by (i) being a member of La Cosa Nostra, (ii) refusing to answer questions put to him under oath about La Cosa Nostra and the payment with Local 295 money of his personal legal fees; and (3) embezzling at least $50,000 of Local 295 money to pay the attorney representing him in the criminal and civil racketeering cases pending in the Eastern District of New York."

On May 22, 1990, the Investigations Officer took sworn testimony from Michael Urso–Pernice, vice president of Local 295, and Anthony Calagna, Jr., recording secretary of Local 295. These officers invoked their fifth amendment privilege against self-incrimination when questioned about the payment of Calagna's legal fees by Local 295. On July 30, 1990, the Investigations Officer filed charges against Urso–Pernice based on his refusal to answer questions under oath regarding La Cosa Nostra involvement with the IBT, and the payment of Calagna's legal fees. On August 30, 1990, the Investigations Officer filed charges against Calagna, Jr., based on his refusal to answer questions under oath about the payment of Calagna's legal fees by Local 295.

After the Investigations Officer filed charges against them, Urso–Pernice and Calagna, Jr., subsequently agreed to testify about Local 295's payment of Calagna's legal fees. On September 5, 1990, Urso–Pernice testified before the Investigations Officer that it was Calagna who initially suggested to the exective board that Local 295 pay his legal fees, that the executive board did not inquire as to the truth of the allegations against Calagna before agreeing to pay his fees, and that the only lawyer consulted about paying Calagna's fees was Pollack himself.

Urso–Pernice also testified that he had recently consulted fellow executive board member Robert Rheinhardt about Local 295's payment of Calagna's legal fees. Urso–Pernice then wrote to Pollack on August 30, 1990 asking Pollack to return the $50,000 retainer. On September 19, 1990, the Investigations Officer took the sworn statement of Rheinhardt. Rheinhardt testified that Pollack had responded to Urso–Pernice's letter and refused to return the $50,000.

Subsequent to all of this activity, the Investigations Officer informed the Independent Administrator that he objected to Pollack representing Calagna in his disciplinary hearing. The Investigations Officer argued that two of the three charges against Calagna relate to the payment to Pollack of Calagna's legal fees by Local 295.

It is against this background that the instant application arises. The Investigations Officer seeks to take the sworn statement of Pollack in connection with the Local 295's payment of Calagna's legal fees.

## II. Discussion

Under ¶ F.12.(C)(i)(d) of the Consent Decree, the Investigations Officer must demonstrate cause to this Court to take the sworn statement of an agent of the IBT. In order for this Court to approve this application to take the sworn statement of Pollack, the Investigations Officer must demonstrate (1) adequate cause to take the statement, and (2) that Pollack is an agent of the IBT as contemplated by ¶ F.12.(C)(i)(d).

### A. Cause to Take the Sworn Statement of Pollack

■ The Investigations Office argues that it is necessary to take Pollack's sworn statement because Pollack himself played a critical role in the executive board's decision to pay Calagna's legal fees. It was Pollack who furnished the opinion to the executive board that Calagna's indictment was a union matter and therefore it was appropriate for Local 295 to pay Calagna's legal fees. Pollack issued this opinion despite the fact that he would be the recipient of that fee. The testimony and correspondence of Urso–Pernice, Calagna, Jr., and Rheinhardt all indicate that Pollack played an important role in the decision of the executive board to pay Calagna's fees. These facts taken in conjunction with the background to this matter show that the

Investigations Officer has demonstrated cause to take the sworn statement of Pollack.

### B. Pollack's Status Under the Consent Decree

Pollack argues in his submissions to the Court that the Investigations Officer cannot take his sworn statement because he is not "an agent of the IBT" as is required by ¶ F.12.(C)(i)(d) of the Consent Decree. Pollack contends that he is the attorney of an individual, Calagna, and does not represent Local 295 or its executive board. Further, he argues that the fact that Local 295 paid his fee is immaterial to the question of whether he is the agent of the IBT.

It is beyond dispute that "an attorney is his client's agent and representative." *Prate v. Freedman*, 583 F.2d 42, 48 (2d Cir.1978); *see Restatement (Second) of Agency* § 1 and comment on subsection 1(3) at (e) (1958). As a result, Pollack is an agent of the IBT for purposes of ¶ F.12.(C)(i)(d) if at any time there was an attorney-client relationship formed between Pollack and the executive board.

In this circuit, "[c]ourts have developed a fairly broad test for whether an attorney-client relationship has formed, rejecting the argument that indicia of a formal relationship are necessary." *Keosian v. Von Kaulbach*, 707 F.Supp. 150, 152 (S.D.N.Y. 1989). Such a relationship may be formed when a party has contact with an "attorney in a professional capacity with the intent to secure legal advice." *Id., quoting Trinity Ambulance Serv., Inc. v. G & L Ambulance Servs., Inc.*, 578 F.Supp. 1280, 1283 (D.Conn.1984).

A review of the facts surrounding Pollack's interaction with the executive board establishes that the executive board had contact with Pollack "in a professional capacity with the intent to secure legal advice." Pollack gave substantive legal advice to the executive board in two separate instances. First, the minutes of the May 16, 1989 meeting of the executive board indicate that Pollack advised the executive board that it was his opinion that the pending charges were "a union matter and that Local 295 could pay any and all legal fees pertaining to this charge." Exhibit B.

Second, Pollack sent a retainer agreement dated May 31, 1989 to the members of the executive board which advised the executive board that "the allegations contained in the [Calagna's] indictment pertain to P.C. Delivery and the collective bargaining agreement with Local 295 of the International Brotherhood of Teamsters." Exhibit C.

Moreover, the facts indicate that the executive board relied on the advice of Pollack to undertake a substantial fee obligation. A member of the executive board, Urso–Pernice, wrote Pollack on August 30, 1990 asking that Pollack return payment made to him by Local 295. In that letter, Urso–Pernice stated that Local 295 paid Pollack because "we received your legal opinion and advice that the payment was lawful and could be made to you at that time." In his reply dated September 5, 1990, Pollack admitted that he directly rendered substantive legal advice to local 295 by referring to "[t]he advice given Mr. Calagna and the Executive Board ..."

Despite Pollack's assertions to the contrary, these facts indicate that Pollack was in an attorney-client relationship with the executive board for the purpose of determining the propriety of Local 295's payment of Calagna's legal fees. Pollack rendered substantive legal advice on that question, and the executive board relied on that advice to enter into the retainer agreement. In this district, no case has been found "where a person who signed a retainer agreement was nevertheless found not to be a client." *Keosian v. Von Kaulbach, supra*, 707 F.Supp. at 152.

This attorney-client relationship between Pollack and Local 295 is sufficient so that Pollack is an agent for the purposes of ¶ F.12.(C)(i)(d).

### III. Conclusion

The Investigation Officer's application to take the sworn statement of Pollack is hereby granted.

So Ordered.