UNITED STATES of America, Plaintiff,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WARE-HOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, et al., Defendants.

No. 88 CIV. 4486 (DNE).

United States District Court, S.D. New York.

May 6, 1991.

See also, 761 F.Supp. 315.

Otto G. Obermaier, U.S. Atty., S.D.N.Y. (Edward T. Ferguson, III, Peter C. Sprung, Asst. U.S. Attys., of counsel), New York City, for the U.S.

Goulston & Storrs (Rudolph G. Pierce, James F. O'Brien, Dennis King, of counsel), Boston, Mass., for the Intern. Broth. of Teamsters.

## OPINION & ORDER

EDELSTEIN, District Judge:

This opinion emanates from the voluntary settlement in the action commenced by plaintiff United States of America (the "Government") against the defendants International Brotherhood of Teamsters (the "IBT") and the IBT's General Executive Board (the "GEB") embodied in the voluntary consent order entered March 14, 1989 (the "Consent Decree"). The provisions in the Consent Decree provided for three Court-appointed officials, the Independent Administrator to oversee the remedial provisions, the Investigations Officer to bring charges against corrupt IBT members, and the Election Officer to oversee the electoral process leading up to and including the 1991 election for International Officers (collectively, the "Court Officers"). The goal of the Consent Decree is to rid the IBT of the hideous influence of organized crime through the election and prosecution provisions.

On March 19, 1991, the Government moved this Court for (i) a declaration that the function of the International Union nominating convention as set out in ¶ F.12.(D) of the Consent Decree may not be altered except by compliance with ¶ L.17 of the Consent Decree; and (ii) an order enjoining the IBT, as the representative of the GEB, and its employees, members, agents, attorneys and affiliates (including local unions, joint councils, and area conferences [hereinafter the "subordinate entities"]) from taking any action to alter the function of the International Union nominating convention as set out in ¶ F.12.(D) of the Consent Decree. This Court held oral argument on this motion on March 20, 1991, after which the parties submitted proposed findings of fact and conclusions of law.

This dispute arises because the Government has reasons to believe that constituencies of the IBT are planning for the IBT convention delegates to "vote out" the Consent Decree, more particularly, the provisions for direct rank and file elections of International Officers. The Government contends that with the Consent Decree's electoral provisions voted out, the IBT would attempt to revert to its prior election process. Thus, the convention delegates themselves elect the General President at the convention, eliminating the rank and file vote, and thereby disenfranchising the membership. The Government seeks to prevent this situation. The Government asks this Court to rule on the legal status of provisions of the Consent Decree.

The validity of the Consent Decree's electoral changes to the IBT constitution are no longer at issue. Accordingly, the relevant ruling for this Court to make is a substantive determination of the legal effect of the Consent Decree in the event that the convention delegates vote against its constitutional changes. In the alternative, this Court will also rule on the Government's motion *de novo*.

### I. Background

The Consent Decree settled the litigation between the Government and the IBT (the "underlying litigation"). As has been discussed more fully in opinions of this Court and the Court of Appeals this RICO litigation involved allegations of a massive racketeering enterprise and conspiracy to participate in that enterprise. *See, e.g. United States v. International Brotherhood of Teamsters, et al.*, 931 F.2d 177 (2d Cir. 1991) (Election Rules); *United States v.*

*International Brotherhood of Teamsters, et al.,* 907 F.2d 277 (2d Cir.1990) (All Writs Act injunction); *United States v. International Brotherhood of Teamsters, et al.,* 905 F.2d 610 (2d Cir.1990) (Friedman & Hughes); *United States v. International Brotherhood of Teamsters, et al.,* 708 F.Supp. 1388 (S.D.N.Y.1989) (Opinion denying motion to dismiss complaint in underlying litigation).

The Consent Decree amended the electoral and disciplinary provisions of the IBT constitution. By ¶ 9(a), the entire Consent Decree immediately became part of the IBT constitution:

> The IBT Constitution shall be deemed and hereby is amended to incorporate and conform with all of the terms set forth in the order.

Paragraph 9(b) further stated that the provisions of the Consent Decree would formally be voted a part of the IBT constitution by the delegates to the 1991 IBT Convention.

> By no later than the conclusion of the IBT convention to be held in 1991, the IBT shall have formally amended the IBT constitution to incorporate and conform with all of the terms set forth in this order by presenting said terms to the delegates for a vote. If the IBT has not formally so amended the IBT constitution by that date, the Government retains the right to seek any appropriate action, including enforcement of this order, contempt, or reopening this litigation.

Among its substantive provisions, the Consent Decree amended the IBT constitution's then existing procedure for electing the General President and International Officers. Under the prior system, officers of IBT subordinate entities had been *ex officio* delegates to the IBT convention. At such a convention, those delegates would directly elect the General President and International Officers. The Consent Decree created a three-step election process culminating in direct rank and file secret ballot elections. First, the local unions have been holding local secret ballot delegate elections during the fall of 1990 and

the spring of 1991. Second, these elected delegates will attend the 1991 IBT national convention to be held June 24–28 in Epcot Center, Florida (the "convention"). There, the delegates will vote (i) to approve the Consent Decree's changes to the IBT constitution as provided by ¶ 9 and ¶ F.12.(D) of the Consent Decree, and (ii) to nominate candidates for IBT International Officers. In the fall of 1991, the IBT will hold a union-wide, direct, secret ballot election of the rank and file for the International Officers.

Since the Consent Decree was executed on March 14, 1989, its scope, terms, and meaning have been repeatedly challenged. With respect to the disciplinary provisions of the Consent Decree, the Court of Appeals and this Court have now determined that the Investigations Officer and Independent Administrator are standins for the General President and GEB, who properly delegated their disciplinary power to those Court Officers pursuant to Article XXVI, section 2 of the IBT Constitution. *United States v. International Brotherhood of Teamsters, supra,* 931 F.2d 177, 184; *United States v. International Brotherhood of Teamsters, supra,* 905 F.2d at 622; December 27, 1990 Opinion & Order, 754 F.Supp. 333, 337 (S.D.N.Y.1990); September 18, 1990 Opinion & Order, 745 F.Supp. 189, 191–92 (S.D.N.Y.1990); August 27, 1990 Opinion & Order, 745 F.Supp. 908, 911 (S.D.N.Y.1990); March 13, 1990 Opinion & Order, 743 F.Supp. 155, 159–60, *aff'd* 905 F.2d 610, 622; January 17, 1990 Opinion & Order, 728 F.Supp. 1032, 1048–57, *aff'd* 907 F.2d 277 (2d Cir.1990); November 2, 1989 Memorandum & Order, 725 F.Supp. 162, 169 (S.D.N.Y.1989); *Joint Council 73, et al. v. Carberry, et al.,* 741 F.Supp. 491, 493 (S.D.N.Y.1990); *Local 27 v. Carberry, et al.,* July 20, 1990 at 3–4, 1990 WL 108348 (S.D.N.Y.1990).

The validity of the Consent Decree's electoral changes are also settled. This Court and the Court of Appeals in turn have held that the electoral changes were properly within the purview of the General President and GEB and binding upon the entire IBT. *United States v. International*

*Brotherhood of Teamsters, supra*, 931 F.2d 177 (1991). The scope of the Election Officer's duties, October 18, 1989 Memorandum & Order, 723 F.Supp. 203, *stay and certification denied* 728 F.Supp. 920 (S.D.N.Y.1989); *appeal dismissed*, No. 89–6252 (2d Cir. Dec. 13, 1989), *cert. denied*, — U.S. ——, 110 S.Ct. 2618, 110 L.Ed.2d 639 (1990), *aff'd*, 931 F.2d 177, and approved a comprehensive set of rules applicable to all facets of the IBT that govern this historic election. July 10, 1990 Opinion & Order, 742 F.Supp. 94 (S.D.N.Y.1990), *aff'd*, 931 F.2d 177.

The Consent Decree's constitutional changes are fully effective and binding on the entire 1.7 million member IBT. Challenges by subordinate entities and individual IBT members to the validity of the disciplinary provisions and electoral provisions have been repeatedly rejected by the Court of Appeals and this Court. *See, e.g., United States v. International Brotherhood of Teamsters, supra*, 905 F.2d 610, *aff'g* March 13, 1990 Opinion & Order, *supra*, (challenges to disciplinary powers of Court Officers rejected); *United States v. International Brotherhood of Teamsters, supra*, 931 F.2d 177, *aff'g* July 10, 1990 Opinion & Order (challenges of electoral process to subordinate entities rejected).

Paragraph L.17 of the Consent Decree, the future practices provision, sets out the obligation of the parties not to alter the understanding of both parties as to the terms of the settlement. Paragraph L.17 states:

> The parties intend the provisions set forth herein to govern future IBT practices in those areas. To the extent the IBT wishes to make any changes, constitutional or otherwise, in those provisions, the IBT shall give prior written notice to the plaintiff, through the undersigned. If the plaintiff then objects to the proposed changes as inconsistent with the terms and objectives of this order, the change shall not occur; provided, however, that the IBT shall then have the right to seek a determination from the Court, of after the entry of judgment dismissing this action, from this Court or any other federal court of competent jur-

isdiction as to whether the proposed change is consistent with the terms and objectives set forth herein.

Paragraph L.17 has been interpreted as requiring approval of any changes to the IBT constitution that would alter the background understanding of the parties as to disciplinary or electoral matters:

> [T]he IBT [must] refrain from any unilateral changes, 'constitutional or otherwise,' in the broad areas covered by the Consent Decree. Paragraph [L.]17 was obviously intended to protect the background understanding of both parties as to what existing rules, regulations, and constitutional provisions would govern the IBT.

*United States v. International Brotherhood of Teamsters, supra*, 905 F.2d at 620 (quoting March 13 Opinion & Order, *supra*, 743 F.Supp. at 163).

## II. Discussion

In the instant matter, this Court must consider (i) ¶ K.16, the application provision of the Consent Decree, (ii) two motions to intervene, (iii) the substantive legal status of the delegates vote at the IBT convention, and (iv) the Government's motion.

### A. The Application Provision of the Consent Decree

█ As a threshold matter, the IBT argues that this Court should not entertain the Government's motion or make any ruling regarding the upcoming convention. The Government argues that the IBT consented to this Court ruling on the instant motion by way of ¶ K.16. I agree.

Paragraph K.16 authorized this Court to "entertain any future applications" by the parties, which includes interpretations and rulings relating to the Consent Decree. Such rulings have been sought and issued numerous times over the past two years. *See* October 18, 1989 Memorandum & Order, *supra*, (interpreting ¶ F.12 to determine scope of duties of Election Officer); November 2, 1989 Memorandum & Order, *supra*, (interpreting ¶ D.5 to determine statute of limitations for bringing discipli-

nary charges); November 16, 1989 Order, (interpreting ¶ F.12.(E) to determine the scope of the Independent Administrator's right to publish a monthly communication in *The International Teamster*); December 12, 1989 Memorandum & Order, 726 F.Supp. 943 (S.D.N.Y.1989), (interpreting ¶ E.10 to determine when collateral lawsuits interfere with work of Court Officers); January 17, 1990 Opinion & Order, *supra,* (interpreting scope of applications to Court under ¶ K.16; status of ¶ F.12 changes); February 27, 1990 Memorandum & Order, 735 F.Supp. 502 (S.D.N.Y.1990), (interpreting ¶ F.12.(E) to permit publication of names of those charged in disciplinary proceedings in *The International Teamster*); March 13, 1990 Opinion & Order, *supra,* (determining Independent Administrator's power to interpret disciplinary portions of IBT constitution by ¶ F.12.(A); inability of IBT to interpret disciplinary provisions of IBT constitution without complying with ¶ L.17); April 9, 1990 Memorandum & Order, 735 F.Supp. 519 (S.D.N.Y.1990), (interpreting "reasonable cause" requirement for sworn statements set out at ¶ F.12.(C)(c) and (d)); July 10, 1990 Opinion & Order, *supra,* (interpreting ¶ F.12.(D) scope of Election Officer duties; ¶ E.10 injunction); November 28, 1990 Memorandum & Order, 133 F.R.D. 99 (S.D.N.Y.1990), (interpreting cause requirement to take statements of IBT agents at ¶ F.12.(C)(i)(d)).

The scope of ¶ K.16 is broad enough to warrant the court to consider prospective matters that may threaten the letter, spirit and intent of this Decree. The IBT's assertion that this motion is speculative is merely a play on words. Further, the IBT has specifically refused to deny the Government's allegations. On March 20, 1991, I directly asked IBT General Counsel Grady whether the IBT disputed the Government's allegations. On behalf of the IBT, General Counsel Grady did not deny those allegations. (Transcript, March 20, 1991 at 24–25).

This matter would never even have to be addressed had the IBT been candid and forthright and assured me that no such plan was in place. The fact that the did

not leads to the reasonable inference that they are up to no good.

Accordingly, the IBT's challenges are meritless.

**B.   Motions to Intervene**

█   Two groups of IBT members, (i) the Durham–Mathis Unity Team, (a slate of candidates running for international office), and (ii) a group of elected delegates to the IBT convention, moved this Court to intervene in the instant motion pursuant to Fed. R.Civ.Pro. 24(a). These applications have no merit. Neither group has demonstrated that its interest in the instant matter is not "adequately represented by existing parties," in this instance the IBT. *See* Fed.R. Civ.Pro. 24(a). It has been established that the election of international officers pursuant to the Consent Decree is a matter solely in the purview of the IBT. *United States v. International Brotherhood of Teamsters, supra,* 931 F.2d at 185. Accordingly, since the instant motion relates exclusively to the Consent Decree, specifically the validity of its provisions, the movants have not met the requirements of Rule 24.

As a result, intervention in this matter is hereby denied in all respects.

**C.   The Status of the Consent Decree**

█   The Government seeks to determine the obligation of the IBT should the convention delegates vote against the Consent Decree's provisions. This issue needs clarification because ¶ 9(a), which stated that the IBT constitution was immediately amended to include all the terms of the Consent Decree, seems in conflict with ¶ 12(D) and ¶ 9(b), which provide that the changes would be brought to a vote at the convention. The language, purpose, and history of the Consent reveal that there is no inconsistency. The parties originally included the convention vote because of their uncertainty whether the IBT could agree to constitutional changes that would bind the subordinate entities by the Consent Decree. The vote was designed to ensure that the subordinate entities would be bound by

their ratification. In the course of litigation over the past two years it has been conclusively determined that the IBT had the power to bind the subordinate entities, and has bound the subordinate entities, thus eliminating any possible uncertainty.

It is clear that the Consent Decree is fully part of the IBT constitution and the law of that union no matter what the convention delegates' vote. The (i) specific language of the Consent Decree and the intent of the parties expressed to me when the Consent Decree was signed, and (ii) legal decisions over the past two years make this self-evident.

First, the specific language of ¶¶ 9(b) and F.12.(D) (the "approval provisions") of the Consent Decree, coupled with the parties' explicit statements clearly reveals the reasons for the inclusion of those provisions. At a conference held on March 14, 1989, after briefly considering the draft Consent Decree submitted to the Court by the parties, this Court pointed out a number of ambiguities in that document. (Transcript, March 14, 1989, at 1–18). Most relevant was this Court's observation that the Consent Decree contained an inconsistency: ¶ 9 stated that the IBT constitution was immediately amended in accordance with all the terms of the Consent Decree, but ¶ 12.(D) provided that the electoral changes would be submitted to the IBT convention delegates for a vote at the 1991 convention. (Tr. at 3).

In response to the Court's request for clarification, counsel for the Government on behalf of the parties stated why they had included those inconsistent terms:

The document makes clear that the constitution of the IBT is deemed amended immediately. In the Government's view, that is a permanent amendment and not subject to change, absent [Governmental approval pursuant to ¶ L.17], without first coming to the Government for change ...
Certain locals officials or local unions may in the future raise legal challenges about the amendment of an international constitution in a manner that was by court order rather than pursuant to the constitution which calls for ratification at a convention. We believe, the Government believes, your Honor, that there is no question that the amendments can be ordered by this Court pursuant to a consent decree, and that they are automatically in effect. But if down the road, there is a challenge by a local official or local union, ratification at the convention would eliminate any legal issue at all.

(Transcript, March 14, 1989 at 15–16). The Court then instructed the parties to insert "clarifying language" on this subject. *Id.* at 16. The parties returned later that day, having rewritten ¶ 9 to the current ¶¶ 9(a) and (b).

As was clearly stated to the Court, the Government insisted that the convention delegates vote on the Consent Decree's electoral changes, first at ¶ F.12.(D), then at ¶ 9(b), in order to eliminate any potential doubt as to the Consent Decree's binding effect on the subordinate entities. The Government in no way intended to give the convention delegates "veto" power over the entire Consent Decree or any portion of it. Nor does the language of the Consent Decree, it purpose or history provide for such power. When the Consent Decree was signed on March 14, 1989, there was no direct legal ruling that established the IBT's ability to amend its constitution by the Consent Decree. It is undoubtedly true that had such precedent been in place on March 14, 1989, the approval provisions never would have been part of the Consent Decree.

Further, there is no doubt that the IBT agreed to the inclusion of the approval provisions for the sole purpose of ameliorating a potential legal challenge to its power to enter into the Consent Decree's constitutional changes. The General Counsel for the IBT, Mr. Grady, publicly stated just after the signing of the Consent Decree in testimony before the United States Senate, that the IBT agreed for the Consent Decree's changes to be submitted to the convention delegates solely at the insistence of the Government:

SENATOR NUNN: How can, the Convention in 1991, or whenever it is going to

occur, how can they—the Convention amend this if it is precluded by this provision [¶ L.17]?

MR. GRADY: I recognize where the Senator is coming from and there does appear to be some inconsistency here.

\* \* \*

However, it was the Government's position that we concur to that, that this was a necessary element of a settlement. That is, for the delegates to, in effect, bring these provisions into their own constitution, and that is why they are there.

*Federal Government's Use of Trusteeships under the RICO Statute: Hearings Before the Permanent Subcomm. on Investigations of the Senate Comm. on Governmental Affairs,* 100th Cong., 1st Sess. at 31. (1989).

Second, interpretations by this Court and subsequently the Court of Appeals have resolved challenges to the validity of the Consent Decree's constitutional changes. The amount of litigation that has ensued boggles the imagination. Repeated litigation has resulted in a line of decisions that conclusively determined the IBT's power to amend the IBT constitution by entering into the Consent Decree, and bind the entire union to those changes. *United States v. International Brotherhood of Teamsters, supra,* 905 F.2d 610, *aff'g* March 13, 1990 Opinion & Order, *supra; United States v. International Brotherhood of Teamsters, supra,* 931 F.2d 177, *aff'g* July 10, 1990 Opinion & Order; *United States v. International Brotherhood of Teamsters, supra,* 907 F.2d 277, *aff'g* January 17, 1990 Opinion & Order, 728 F.Supp. 1032. *See also Joint Council 73 v. Carberry, et al., supra; Local 27 v. Carberry, supra.* In consequence, the precise uncertainty that led to the inclusion of the approval provisions has been resolved by this Court and the Court of Appeals over the past two years. An examination of those decisions reveals how this uncertainty has been resolved.

With respect to the disciplinary provisions of the Consent Decree, Anthony Hughes, an IBT officer from local 507 in Cleveland, Ohio, argued before this Court and the Court of Appeals that the Consent Decree's disciplinary changes to the IBT constitution were not binding on him because the IBT did not have the power to unilaterally amend its constitution at judicial direction. The Court of Appeals specifically rejected that argument:

> Hughes contends that the IBT cannot unilaterally change its constitution ... and then make the new terms binding on [its affiliated local unions and members]. This is so, Hughes maintains, because various provisions of the IBT constitution explicitly reserve the power of amendment to the International Convention of the IBT, by vote of its duly elected delegates.
>
> ... Hughes ... clearly could be bound by terms of the disciplinary mechanism set in place by the Consent Decree. This is so because the investigatory and disciplinary mechanism of the Court Officers are proper delegations of the powers of the IBT General President and the GEB within the scope of the IBT constitution that binds all members, and because the IBT constitution contemplates amendment by the GEB, under the circumstances of this case, as a result of judicial direction.

*United States v. International Brotherhood of Teamsters, supra,* 905 F.2d at 622.

With respect to the election provisions of the Consent Decree, the parameters of the election process set out in the Consent Decree has been continually contested over the past eighteen months by the IBT and the subordinate entities. The Court of Appeals has recently rejected all challenges to the Consent Decree's electoral changes to the IBT constitution. *United States v. International Brotherhood of Teamsters, supra,* 931 F.2d 177.

The electoral-related litigation began in October, 1989, where in the October 18, 1989 Order, this Court ruled that the power of the Election Officer at ¶ F.12.(D) to "supervise" the 1991 IBT election must "be interpreted in its most expansive and proactive meaning." October 18, 1989 Memorandum & Order, *supra,* 723 F.Supp. at 206.

In that order, this Court further authorized the Election Officer to promulgate rules to govern the delegate and International Officer election. *Id.* at 207.

On July 10, 1990, this Court approved, as modified, the set of rules promulgated by the Election Officer to govern the 1991 election. July 10, 1990 Opinion & Order, *supra,* 742 F.Supp. 94. In objecting to those rules, local unions argued that they were not bound by the Consent Decree's electoral changes to the IBT constitution because the IBT could not unilaterally agree to such changes absent their approval at an IBT convention. Those challenges were rejected. *Id.* at 98.

On April 12, 1991, the Court of Appeals affirmed this Court's July 10, 1990 Opinion. In that decision, the Court of Appeals specifically rejected arguments by IBT subordinate entities that the Consent Decree's electoral provisions were impermissible changes to the IBT constitution. The Court of Appeals adopted its reasoning in the *Friedman & Hughes* opinion, and held that the pursuant to Article XXVI, Section 2 of the IBT constitution, the IBT could amend its constitution to incorporate the Consent Decree's electoral changes at judicial direction:

> [The Affiliates] argue that those provisions [of the Consent Decree] that displace the IBT Constitution are not binding on them unless and until the amendments have been ratified at an IBT Convention properly constituted under the original IBT Constitution. We disagree.
>
> \*      \*      \*      \*      \*      \*
>
> Where the subject matter of an IBT constitutional provision relates to the power of the international rather than of local unions, the IBT may agree to a consent decree entered by a court that renders the provision inoperative and that IBT local unions and members are bound by the terms of that decree.
>
> \*      \*      \*      \*      \*      \*
>
> In the instant matter, the IBT constitutional provisions rendered inoperative concern not the powers of the international union but the method by which international officials—Convention delegates and international officers—are selected....The challenged provisions do not relate to, or intrude upon, the governance of local unions or the conduct of collective bargaining by local unions....We believe, therefore, that our decision in the instant matter fall within the rationale of *Friedman & Hughes* and that the Affiliates are bound by the Consent Decree.
>
> \*      \*      \*      \*      \*      \*
>
> [W]e ... believe that an Affiliate or member cannot veto the IBT's settlement of this unique civil RICO action, at least insofar as the Consent Decree provides for membership elections of Convention delegates and IBT officers.

*Id.* 931 F.2d at 184–186. This line of decisions has unequivocally determined that the Consent Decree's changes to the IBT constitution are valid and binding without the approval of a convention of the IBT. *Id.* This Court and the Court of Appeals have conclusively held that the IBT had the power to agree to the constitutional changes ordered by the Consent Decree, and that the subordinate entities are so bound by those new provisions. *Id.*

Accordingly, the Court finds that the specific reason why the parties in including the approval provisions is no longer at issue. Whatever the outcome of the delegates votes as to the electoral and disciplinary changes to the IBT constitution, those provisions will be in full effect in accordance with the Consent Decree. The Consent Decree's provisions may only be changed through full compliance with ¶ L.17, subject to approval by the Government or this Court.

As a result of these determinations, the vote of the delegates on the Consent Decree will now have no legal effect. No action taken by the IBT at the convention can undercut the provisions of this Consent Decree.

I remind the IBT that it *voluntarily* agreed to the Consent Decree, and with it free rank and file elections. The past two years have demonstrated that the IBT had no intention of living up to its end of the

agreement. The IBT has made every attempt to limit the scope and restrict the terms of the Consent Decree, and each time it has lost. But the time for challenges to the Consent Decree has now passed, and the IBT must live with the Consent Decree as written by the parties, approved by the Court, and repeatedly interpreted by this Court and the Court of Appeals.

I tend to be amused when I remember that the IBT by its representatives have made heroic statements from time to time to reaffirm their commitment to a union free of corruption and their dedication to free elections. How I wish that some of these statements could have been true. Time has proved, however, that these statements are empty of any meaning or purpose for the good of this important union.

### D. The Motion for Declaratory and Injunctive Relief the Consent Decree

While this Court's ruling that the electoral provisions of the Consent Decree are binding upon the entire IBT regardless of the outcome of the convention's vote on those amendments also determines the Government's specific requests for relief in its motion, this Court will in the alternative also consider the Government's motion on its merits. In order to decide that motion, this Court must consider (i) whether the parties to the Consent Decree and this Court directly foresaw this situation, and inserted a specific remedy at ¶ 9(b), (ii) the standards under which these orders should issue, and (iii) the merits of the Government's application. This Court has already held that ¶ K.16 permits prospective applications for relief.

#### 1. The Parties' Prior Consideration of this Issue

■ The IBT argues that the parties' March 14, 1989 colloquy with the Court regarding the inconsistency in the Consent Decree demonstrates that the parties foresaw the possibility that the delegates would vote against the Consent Decree's changes. At the Court's direction, a specific remedy, ¶ 9(b) of the Consent Decree, was inserted. As a result, the IBT contends that this Court should refrain from issuing this interpretation of the Consent Decree. This argument is without merit.

The specific language of the Consent Decree permits the Government's motion. Paragraph 9(b) provides that in the event that the IBT has not formally voted to amend its constitution by the end of the IBT convention, the Government may seek *"enforcement of this order,* contempt, or re-open[ing of] this litigation." ¶ 9(b) (emphasis added). In this application, the Government is asking this Court to rule that the future practices provision, ¶ L.17, is still in effect even if the convention delegates vote against the Consent Decree.

The Consent Decree is a binding, coercive order of this Court which obligates the parties to adhere to its terms. Assuming *arguendo* that the delegates could vote out the Consent Decree's changes, the terms of the Consent Decree would still be in effect as an order of this Court binding on the General President and GEB as the representatives of the IBT. That order includes the Government's right to seek the remedies listed at ¶ 9(b), and the obligation of the IBT to adhere to ¶ L.17. Such was the specific intent of the parties in constructing the Consent Decree.

In addition, the Government's motion is wholly consistent with the terms of ¶ 9(b). That provision gave the Government the right to "seek enforcement of this order" in enumerated ways. This motion essentially asks for a determination as to the status of ¶ L.17 should the changes not be approved. Rationally, such a ruling must be seen as the Government seeking enforcement of another provision of the Consent Decree.

#### 2. The Standards for the Instant Relief

■ With respect to the issue of the standards that must be met for this ruling, the IBT's argument that the Government must meet this circuit's standards for a preliminary injunction and declaratory judgment are not relevant. The Government has properly sought rulings setting out the rights and responsibilities of the

parties with respect to the Consent Decree as is their right under ¶ K.16. While the IBT correctly identifies the standards for seeking a preliminary injunction or instituting a declaratory judgment action, those standards are not relevant in the context of this ongoing case.

It is appropriate for this Court to issue injunctive and declaratory relief in the ongoing implementation of the Consent Decree. The power of the Court to issue such relief is to be found in the Consent Decree itself. *See New York State Association for Retarded Children, Inc. v. Carey,* 596 F.2d 27, 38 (2d Cir.), *cert. denied* 444 U.S. 836, 100 S.Ct. 70, 62 L.Ed.2d 46 (1979). As has been stated, this Court finds that ¶ K.16 specifically foresaw such rulings.

Further, this Court has the authority under the civil RICO statute to issue "such restraining orders or prohibitions, or take such other actions ... as it shall deem proper." 18 U.S.C. § 1964(b). The equitable relief moved for by the Government may be issued by this Court in the context of this ongoing civil RICO action.

The Government has demonstrated that it is an appropriate exercise of this Court's equitable power to issue declaratory and injunctive relief in this unique situation. The IBT convention that is to take place June 24–28 1991 will mark a watershed in the American Labor movement. The IBT, this nation's largest labor union, will vote to nominate candidates for the fall general rank and file secret ballot election for international office for the first time in its history. The convention will mark the culmination of over two years of work to achieve these noble electoral goals. Millions of dollars in union members' funds have already been spent in the course of this election. The convention itself is a large event, with over 2000 IBT delegates, and 10,000 family members travelling to Florida for five days.

I agree with the Government that a matter so important must be settled in advance of the convention. To do otherwise would permit the convention to plunge into total disarray. That ¶ K.16 provided for the Court to issue declaratory and injunctive relief in such a situation is logical and rational. That RICO and the All Writs Act permits such rulings is also clear.

### 3. The Government's Application

■ With respect to the declaratory relief, as a result of the subsequent judicial determinations as to the legal status of the Consent Decree, and as an order of this Court, ¶ L.17 of the Consent Decree will be in effect for the three-year duration of the Consent Decree. In accordance with that provision, the Government or the Court must approve any changes to the Consent Decree, or the IBT constitutional provisions that implicate the Consent Decree, taken by the IBT.

Paragraph L.17 has been interpreted by the Court of Appeals and this Court such that:

> [T]he IBT [must] refrain from any unilateral changes, 'constitutional or otherwise,' in the broad areas covered by the Consent Decree. Paragraph [L.]17 was obviously intended to protect the background understanding of both parties as to what existing rules, regulations, and constitutional provisions would govern the IBT.

*United States v. International Brotherhood of Teamsters, supra,* 905 F.2d at 620 (quoting March 13 Opinion & Order, *supra,* 743 F.Supp. at 163). The convention delegates rejection of the Consent Decree's changes would constitute an alteration of the explicit understanding of the parties as to the procedure for electing international officers. As with any such alteration of the background understanding of the parties, such a change must be in compliance with ¶ L.17. Thus, the Court declares that ¶ L.17 requires that any substitute electoral procedure must be first approved by the Government or by this Court. Failing this procedure, the existing procedure set out in the Consent Decree would remain in effect.

With respect to the equitable relief sought by the Government, there can be no doubt that every action must be taken to assure the implementation of this most important portion of the Consent Decree, the honest, fair, secret-ballot election. It is

undoubtedly an appropriate exercise of this Court's equitable power to enjoin any activity taken by the IBT that would deny the membership their right to decide the legitimate leadership of their union.

Further, the IBT explicitly agreed in ¶ E.10 of the Consent Decree that it would not "obstruct or otherwise interfere" with the implementation of the Consent Decree, or the work of the Court Officers. Since the Election Officer must supervise the election according to the election rules, any action taken to engineer a vote against the current electoral provision would constitute interference with the work of the Election Officer. Accordingly, any action taken to further the rejection of the Consent Decree's changes would violate the existing injunction in the Consent Decree. Thus, the IBT is put on notice that it shall not take action to vote against the very Consent Decree which it signed.

The Government's application is granted.

### III. Conclusion

The Government's application for interpretations and rulings of the Consent Decree is hereby granted.

IT IS HEREBY ORDERED that the motions to intervene are denied.

IT IS HEREBY ORDERED that the electoral and disciplinary provisions of the Consent Decree are part of IBT constitution and binding on the subordinate entities regardless of the vote of the delegates at the IBT convention unless its provisions are changed in accordance with ¶ L.17 of the Consent Decree.

IT IS FURTHER ORDERED that the function of the 1991 IBT International Union nominating convention as delineated in paragraph F.12.(D) of the Consent Decree may not be expanded, limited, altered, or otherwise changed in any way without full compliance with the provisions of ¶ L.17 of the Consent Decree.

IT IS FURTHER ORDERED that the IBT, as the representative of the GEB and its employees, members, agents, attorneys and affiliates (including local unions, joint councils, and area conferences), is hereby enjoined from taking any action in an attempt to cause any expansion, enhancement, limitation, or other change in the function of the 1991 IBT International Union nominating convention as delineated in paragraph F.12.(D) of the Consent Decree, except action expressly authorized by paragraph L.17 of the Consent Decree.

So Ordered.