**UNITED STATES of America, Plaintiff–Appellee,**

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, the Commission of La Cosa Nostra, Anthony Salerno, also known as Fat Tony, Matthew Ianniello, also known as Matty the Horse, Anthony Provenzano, also known as Tony Pro, Nunzio Provenzano, also known as Nunzi Pro, Anthony Corallo, also known as Tony Ducks, Salvatore Santoro, Christopher Furnari, Sr., also known as Christie Tick, Frank Manzo, Carmine Persico, also known as Junior, also known as The Snake, Gennaro Langella, also known as Gerry Lang, Philip Rastelli, also known as Rusty, Nicholas Marangello, also known as Nicky Glasses, Joseph Massino, also known as Joey Messina, Anthony Fi-**

carotta, also known as Figgy, Eugene Boffa, Sr., Francis Sheeran, Milton Rockman, also known as Maishe, John Tronolone, also known as Peanuts, Joseph John Aiuppa, also known as Joey O'Brien, also known as Joe Doves, also known as Joey Aiuppa, John Phillip Cerone, also known as Jackie the Lackie, also known as Jackie Cerone, Joseph Lombardo, also known as Joey the Clown, Angelo Lapietra, also known as Nutcracker, Frank Balistrieri, also known as Mr. B., Carl Angelo DeLuna, also known as Toughy, Carl Civella, also known as Corky, Anthony Thomas Civella, also known as Tony Ripe, General Executive Board, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Jackie Presser, General President, Weldon Mathis, General Secretary–Treasurer, Joseph Trerotola, also known as Joe T, First Vice President, Robert Holmes, Sr., Second Vice President, William J. McCarthy, Third Vice President, Joseph W. Morgan, Fourth Vice President, Edward M. Lawson, Fifth Vice President, Arnold Weinmeister, Sixth Vice President, John H. Cleveland, Seventh Vice President, Maurice R. Schurr, Eighth Vice President, Donald Peters, Ninth Vice President, Walter J. Shea, Tenth Vice President, Harold Friedman, Eleventh Vice President, Jack D. Cox, Twelfth Vice President, Don L. West, Thirteenth Vice President, Michael J. Riley, Fourteenth Vice President, Theodore Cozza, Fifteenth Vice President, Daniel Ligurotis, Sixteenth Vice President, Salvatore Provenzano, also known as Sammy Pro, Former Vice President, Defendants,

Star Market Company, Appellant.

No. 797, Docket 91–6270.

United States Court of Appeals, Second Circuit.

Argued Nov. 27, 1991.

Decided Jan. 22, 1992.

Robert J. Bray, Jr., Blue Bell, Pa. (Henry F. Siedzikowski, Elliot Bray & Riley, Blue Bell, Pa., Robert J. Zastrow, Stroock & Stroock & Lavan, New York City, of counsel), for appellant.

Edward T. Ferguson, III, Asst. U.S. Atty. (Otto G. Obermaier, U.S. Atty. S.D.N.Y., Richard W. Mark, Asst. U.S. Atty., of counsel), New York City, for plaintiff-appellee.

Before TIMBERS, PIERCE and WALKER, Circuit Judges.

WALKER, Circuit Judge:

Star Market Company (Star Market) appeals from an order of the United States District Court for the Southern District of New York, David N. Edelstein, *Judge,* entered on October 29, 1991. 776 F.Supp. 144. That order directed Star Market to comply with the decision of an Independent Administrator, itself affirming the decision of an Election Officer, both officers having been appointed pursuant to a consent decree (Consent Decree) relating to the affairs of defendant International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO (IBT). The order required Star Market to reinstate a union employee whom it had dismissed allegedly for "stealing company time."

Star Market argues that the reinstatement proceedings conducted by the Consent Decree Officers, and enforcement hearing held in the district court, ran afoul of constitutional due process requirements. Star Market further contends that the district court's enforcement of the Officers' reinstatement order effectively reversed a binding arbitration award in violation of federal labor law. Because we find no merit in either argument, we affirm the district court's order in its entirety.

## BACKGROUND

This appeal joins the ranks of what has now become a legion of cases arising out of the government's enforcement of the Consent Decree entered into on March 14, 1989 by the United States Government and the IBT. The Consent Decree was a critical part of the settlement of the government's civil RICO action, *see* Racketeer Influenced and Corrupt Organizations Act of 1970, 18 U.S.C.A. §§ 1961–1968 (1984 & Supp.1991), brought in 1988 in an effort to rid the IBT of its domination by organized crime. The Consent Decree instituted sweeping structural reforms of the IBT's electoral and disciplinary processes. Its "central purpose" is to insure "[t]he fair and open conduct of the 1991 IBT election," *U.S. v. IBT (Yellow Freight),* 948 F.2d 98, 100 (2d Cir.1991) as a means of freeing IBT's General Executive Board from the grip of La Cosa Nostra. The decree authorized the appointment of three court officers to oversee certain aspects of the IBT's affairs: an Election Officer (EO), an Investigations Officer, and an Independent Administrator (IA). The officials' particular functions have been discussed in previous opinions of this Court and will not be elaborated upon here. *See generally, United States v. IBT,* 905 F.2d 610, 613 (2d Cir.1990). It suffices to state that they have been charged with implementing the free and fair election of the IBT's governing officials, and that the district court has exclusive jurisdiction to "decide any issues relating to the actions or authority of the [Independent] Administrator." *Id.*

The facts relevant to our review of the present controversy are largely set forth in the district court's opinion and order in *United States v. IBT,* 776 F.Supp. 144 (S.D.N.Y.1991). We need only summarize them here. Other facts are ascertainable from the record on appeal, including letters between the parties, the decisions of the labor arbitrator, the EO and the IA.

On May 13, 1991, Star Market terminated Neal J. Henderson, a union steward, from his employment with the company. At the time he was fired, Henderson had been employed by the Star Market supermarket

chain for fourteen years, and was working as a warehouseman in the perishables department of one of the company's Boston-area facilities. Star Market's stated reason for terminating Henderson was that, on May 2, Henderson had "stolen company time" by leaving his assigned facility before his pre-shift overtime period had ended. Henderson admits leaving his post 25 minutes early on May 2 in order to purchase cold medicine and something to eat, as well as to conduct some union business before beginning his next shift. He argues, however, that it was common practice for Star Market employees who were working pre-shift overtime to take an early break if their work was complete.

Henderson claims that the true reason for his termination was to retaliate against him for his union election activities. In the most recent election held by his Teamster local, IBT Local 25 (Local 25), Henderson had opposed the slate of powerful incumbents, successfully campaigned for an insurgent slate of candidates, and was himself elected as a Local 25 delegate to the International Union convention. In response to these activities, Star Market supervisors made disparaging comments to Henderson regarding his candidacy for delegate, as well as his support for the opposition slate. Henderson contends that Star Market's negative reaction to his involvement in union politics culminated in his being fired.

After being dismissed from his job, Henderson filed a grievance pursuant to the collective bargaining agreement (CBA) between Local 25 and Star Market, claiming, *inter alia*, that his discharge was politically motivated. He also filed a protest with the EO alleging that the retaliatory nature of his dismissal violated the Election Rules promulgated under the Consent Decree. The EO deferred decision on Henderson's protest until the contractual grievance process had culminated in a decision, but notified the parties that his investigation would proceed. The EO also advised the parties that he would not be bound by any decision reached in the grievance proceedings conducted pursuant to the CBA.

The CBA's grievance procedure provided for a two-step review. The first step consisted of a joint grievance panel comprised equally of union and employer panelists. If the panel was unable to reach a consensus, the second step was for the grievance to be submitted to binding arbitration before an independent arbitrator. Henderson advised the EO of his concern that he would not receive fair treatment from the grievance panel because a powerful incumbent union official, opposed by Henderson, controlled the selection of the union panelists. The EO advised Star Market of Henderson's concern and noted that the EO's review of the Election Rule protest would also include a review of the grievance process itself and the union's representation of Henderson in that process.

On May 22, 1991, the joint grievance panel deadlocked on Henderson's grievance, and the matter went to arbitration. On June 12, 1991, an arbitrator held a hearing on Henderson's grievance. On June 17, relying exclusively upon the provision of the CBA entitled, "Breaks and Free Time," the arbitrator found Henderson's discharge to be justified. Although Henderson argued that he was a victim of retaliation, the arbitrator did not address the issue.

Thereafter, the EO completed his own investigation of Henderson's protest. The investigation revealed that Star Market's dismissal of Henderson was a disproportionately severe sanction as compared to those imposed for similar offenses by other employees. Other shift-break infractions of an equal magnitude had resulted in company discipline ranging from no sanctions whatsoever to verbal warnings. Indeed, in one case where an employee became verbally abusive to a supervisor and ultimately assaulted the supervisor with a billiard ball after the supervisor found him playing pool on company time, the employee was only suspended for twenty days.

The EO also considered a Star Market employee notice that had been posted after Henderson's arbitration hearing. This notice stated "that certain shifts are some-

how unsure of the times they are to go to break," and went on to clarify the company's break-time policy. The notice also advised employees that the rules set out with respect to shift-break time would not go into effect until June 30, 1991 since "there are a couple of changes." Coming, as it did, on the heels of the Henderson arbitration, this notice virtually conceded the company's prior non-enforcement of the contract provision used to justify Henderson's termination. In light of this evidence, the EO concluded that Star Market had retaliated against Henderson for engaging in Union Election campaign activity, which is protected by the Election Rules, and ordered Star Market to reinstate Henderson with back pay and full benefits.

As provided for in the Election Rules, Star Market appealed the EO's decision to the IA. On September 16, 1991, the IA conducted a hearing by telephone—a procedure consented to by Star Market—and accepted a written submission from Star Market which contained legal arguments concerning jurisdiction, deference to the arbitrator and due process. On September 18, 1991, the IA issued a written decision affirming the EO's decision in all respects.

Star Market did not appeal the IA's decision to the district court and steadfastly refused to comply with the IA's direction to reinstate Henderson. On October 24, 1991, at the EO's and IA's request, the government brought an Order to Show Cause in the district court directing Star Market to demonstrate why the court should not, *inter alia,* affirm the IA's decision and direct Star Market to fully comply within 24 hours or be in civil contempt. On October 29, 1991, the district court granted the order and imposed a coercive sanction of $10,000 per day should Star Market fail to comply. Star Market appealed. After the district court declined to stay its order pending appeal, another panel of this court entered a stay. We now vacate the stay and affirm.

## DISCUSSION

### I. *State Action and Due Process Claims*

Star Market argues that the Henderson protest proceedings conducted by the EO, and IA's review and affirmance of the EO's decision, violated Star Market's procedural due process rights under the United States Constitution. More precisely, Star Market contends that it was not a party to the Consent Decree and is not bound by it; that it was denied sufficient notice of the charges lodged against it; that the EO and the IA did not afford it a meaningful opportunity to present evidence and be heard; and that the EO and the IA were not sufficiently impartial to pass constitutional muster. Star Market further argues that these alleged constitutional infirmities affected the enforcement proceedings held in the district court, and therefore the district court's order should be reversed. We are not persuaded by any of these arguments.

■ As a threshold matter, in order for Star Market to succeed on its due process claim it must establish that the officers appointed pursuant to the Consent Decree were "state actors" in the constitutional sense. *See Blum v. Yaretsky,* 457 U.S. 991, 1002, 102 S.Ct. 2777, 2784, 73 L.Ed.2d 534 (1982). This argument was considered and found wanting in a prior *IBT* litigation. In *U.S. v. IBT (Senese),* 941 F.2d 1292, 1295–97 (2d Cir.), *petition for cert. filed,* 60 U.S.L.W. 3376 (U.S. Oct. 10, 1991) (No. 91–717), this Court specifically held that the IA's actions were not state actions, and thus were not circumscribed by the provisions of the Federal Constitution. *Senese* arose out of an appeal from disciplinary sanctions imposed upon IBT officials by the IA for violations of the amended IBT Constitution. This Court reasoned that since the IA acted pursuant to the IBT Constitution, a private charter, and the IA was himself a paid official of the IBT, he was not a state actor. 941 F.2d at 1296.

■ Star Market argues that even if the Consent Decree officers were not themselves state actors, the district court is an arm of the government, and its enforcement of the IA's decision supplies the requisite state action needed to trigger due process rights. However, in *Senese,* we put this argument to rest as well. There

we concluded that the district court's affirmance of the IA's disciplinary action did not leave the imprimatur of governmental interference. "[G]overnmental oversight of a private institution does not convert the institution's decisions into those of the State, as long as the decision in question is based on the institution's independent assessment of its own policies and needs." 941 F.2d at 1297. The same reasoning applies equally in this case. There was no state action here, and thus the officers' intervention did not implicate constitutional due process concerns.

■ In any event, even if state action had been involved, we do not think that Star Market suffered from the deprivation of due process safeguards. In *Yellow Freight*, 948 F.2d at 104, we held that by virtue of the All Writs Act, 28 U.S.C. § 1651(a) (1988), the Consent Decree could be enforced against persons and entities not party to its entry. But we also held that the procedures employed in such enforcement would have to be " 'agreeable to the usages and principles of law.' " *Id.* (quoting the All Writs Act). We then carefully evaluated the procedures for the administrative and judicial review of protests brought pursuant to the Consent Decree Election Rules, and concluded that they "accorded adequate procedural protections to satisfy the All Writs Act." *Id.* at 105. The same procedures were available to Star Market in this case. As the government points out, *Yellow Freight*'s conclusion that the procedures satisfied the All Writs Act, "virtually compels the conclusion that those procedures satisfy due process."

■ Furthermore, Star Market's claim that it was denied procedural due process is belied by the record. In a May 14, 1991 letter to Henderson, Star Market and Local 25, the EO notified Star Market of Henderson's Election Rule protest, supplied it with a copy of Henderson's grievance letter, and solicited any information that Star Market had regarding the matter. In deferring his decision until after the arbitrator rendered his decision, the EO effectively gave Star Market more than three months to prepare and submit its

case. After the EO found Star Market to have violated the Election Rules and ordered Henderson's reinstatement with back pay and benefits, Star Market took an appeal to the IA. At the option of the parties, including Star Market which was represented by counsel, the IA conducted a telephone hearing. The IA invited all parties to submit written statements for his consideration and received a submission from Star Market.

■ Finally, Star Market declined to exercise its right of appeal from the IA to the district court under the Election Rules. Instead it chose to sit back, do nothing and force the government to initiate contempt proceedings in the district court. Star Market's argument that it was not required to be proactive, but rather could disregard the IA's order until judicially required to comply, draws no support from the NLRB cases that it cites. *See e.g. In re the National Labor Relations Board*, 304 U.S. 486, 492, 58 S.Ct. 1001, 1004, 82 L.Ed. 1482 (1938); *NLRB v. P\*I\*E Nationwide, Inc.*, 894 F.2d 887, 887–90 (7th Cir.1990). Those cases, which hold that the NLRB's orders are not self-executing, and the underlying statutory law upon which they rely, are unrelated to the procedures at issue here. In this case, Star Market was required to comply with the appellate procedures set out in the Election Rules. The Election Rules provide that a party must obey an order of the IA "unless it is stayed or overturned by the Court." Election Rules, Article XI, § 1(a)(8). Thus, unlike orders of the NLRB, the IA's decisions are self-executing, and by failing to seek a stay or reversal in the district court, Star Market waived any due process objections that it had with respect to the IA's order to reinstate Henderson. *Cf. N.L.R.B. v. Local 282, International Brotherhood of Teamsters*, 428 F.2d 994, 999 (2d Cir.1970) (civil contempt proceeding is not an avenue for collateral attack of the underlying order where appropriate procedures for reviewing the order were not attempted).

II. *Displacement of the Arbitrator's Decision*

Star Market's second argument is more ingenuous than its first. It contends that

the district court's enforcement of the IA's decision, which effectively overruled the independent arbitrator's award upholding Henderson's dismissal, contravened long standing federal labor policy favoring arbitration and federal procedures governing judicial review of arbitration awards. *See* Section 301 of the Labor–Management Relations Act (LMRA), 29 U.S.C. § 185. However, we are not persuaded by Star Market's argument.

Certain labor disputes may come under the provisions of a collective bargaining contract as well as within the purview of the Consent Decree. Here, the grievance arbitration conducted pursuant to the CBA, and the parallel Election Rule proceedings held by the EO and IA, reached conflicting results with respect to Henderson's reinstatement. Under these circumstances the question arises as to which determination is controlling.

■ Star Market points out that the labor contract under which Henderson was employed contained an anti-discrimination provision to protect those employees who engaged in union politics. The Election Rules more specifically sought to insure that union members did not suffer retaliation as a result of disfavored campaign activities related to the 1991 national IBT election. Star Market argues that where the collective bargaining agreement affords protections which encompass rights contained in the Election Rules, the favored status of binding arbitration under federal labor law preempts related Election Rule enforcement proceedings. We disagree. Rather, we hold that (1) where a consent decree provides individual union members with a source of independent rights as a means of effectuating the consent decree's intended goal, and (2) where the purpose of the consent decree transcends the localized function of particular collective bargaining agreements and, instead, impacts upon the structure and processes of a national parent union, federal policy favoring independent arbitration of labor disputes does not preempt the procedures created to insure the implementation of the consent decree.

Our conclusion draws support from prior holdings of this Court. In *Yellow Freight,* we held that the NLRB did not have sole jurisdiction over an Election Rule protest that also fit the description of an unfair labor practice. The protest concerned an employer's no-solicitation rule barring non-employee union members from campaigning for union office on the employer's property. "We conclude[d] that the NLRB [did] not have exclusive jurisdiction over the conduct at issue on this appeal, and that the district court and its appointed officers accordingly did not err in addressing it." *Yellow Freight,* 948 F.2d at 106.

■ *Yellow Freight*'s holding stemmed largely from our desire to "avoid inconsistent interpretations of, and judgments regarding, the Consent Decree, and also to avoid repetitive litigation that would distract the government and the court-appointed officers from implementation of the Consent Decree." *Id.* We have considered the interest in avoiding inconsistent interpretations of the Consent Decree great enough to sustain "an injunction prohibiting all members and affiliates of the IBT from initiating any legal proceeding relating to the Consent Decree 'in any court *or forum* in any jurisdiction' (emphasis added) other than the district court from which this appeal was taken...." *Id.* at 105 (quoting *United States v. IBT,* 907 F.2d 277, 279 (2d Cir.1990)). This paramount interest informs our view of the instant controversy. While arbitration pursuant to collective labor agreements may not fall directly within the sweep of the above mentioned injunction, this case demonstrates that it nevertheless can interfere with the Consent Decree's effective implementation. Arbitration cannot be the loophole through which the union and certain employers may avoid the dictates of the Consent Decree and the rules promulgated thereunder. Therefore, we conclude that to the extent an arbitration award is inconsistent with an order implementing the Consent Decree, the Consent Decree order must govern.

■ Our holding is grounded on the principle that a federal court need not defer to an arbitrator's decision when a plaintiff's

labor-related claim stems from a source of legal rights that is separate from, although possibly coextensive with, a collective bargaining agreement. *See McDonald v. City of West Branch*, 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984) (42 U.S.C. § 1983); *Barrentine v. Arkansas–Best Freight System, Inc.*, 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) (Fair Labor Standards Act); *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) (Title VII). Star Market points out that these cases involved independent rights derived from federal statutes, and that a right of action under statutory law reflects a public policy which is not waived by virtue of a labor agreement to arbitrate. Star Market contends that since the Consent Decree is not an act of Congress, it does not have the same overriding force as a statute and cannot be used to displace a binding arbitration provision.

Our review of these decisions, however, shows that they did not simply turn on the statutory nature of the independent rights involved. Rather, these decisions relied as much upon considerations of the limits on both the arbitrator's jurisdictional basis, and the arbitrator's particular realm of competence.

In *Alexander v. Gardner–Denver Co.*, the Supreme Court stated that,

> [a]s the proctor of the bargain, the arbitrator's task is to effectuate the intent of the parties. *His source of authority is the collective-bargaining agreement*, and he must interpret and apply that agreement in accordance with the "industrial common law of the shop" and the various needs and desires of the parties.

415 U.S. at 53, 94 S.Ct. at 1022 (emphasis added). *See also Barrentine*, 450 U.S. at 744, 101 S.Ct. at 1446 ("An arbitrator's power is both derived from, and limited by, the collective bargaining agreement."); *McDonald*, 466 U.S. at 290, 104 S.Ct. at 1803 (same).

Similarly, the Supreme Court has viewed an arbitrator's professional skill as narrowly circumscribed. While arbitrators are normally well versed in the workings of the industry from which a particular dispute arises, their field of expertise is limited to resolving individual contract disputes which rarely involve broad public interest considerations. Accordingly, "[b]ecause the 'specialized competence of arbitrators pertains primarily to the law of the shop, not the law of the land,' ... many arbitrators may not be conversant with the" issues surrounding the enforcement of the Consent Decree. *Barrentine*, 450 U.S. at 743, 101 S.Ct. at 1446 (quoting *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581–82, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960)).

■ Henderson's Election Rule protest raises both of these considerations. To begin with, whether or not the Consent Decree carried the force of a federal statute, it was undeniably a source of rights separate and distinct from the CBA. These rights were "designed to supplement, rather than supplant" the rights enjoyed by employees under the CBA. *Gardner–Denver Co.*, 415 U.S. at 48, 94 S.Ct. at 1019. Thus, it is clear that an arbitrator was without jurisdiction to resolve protests arising under the Election Rules, *see Barrentine*, 450 U.S. at 744, 101 S.Ct. at 1446, even though "certain contractual rights are similar to, or duplicative of, the substantive rights secured by" the Consent Decree. *Gardner–Denver Co.*, 415 U.S. at 54, 94 S.Ct. at 1022. Moreover, "in instituting an action under [the Consent Decree, Henderson was] not seeking review of the arbitrator's decision. Rather he [was] asserting a [separate] right independent of the arbitration process." *Id.*

■ Nor was the EO bound by the arbitrator's factual conclusions. *Cf. McDonald*, 466 U.S. at 292, 104 S.Ct. at 1804 (arbitration award has no *res judicata* or collateral estoppel effect in subsequent § 1983 action). In a similar context, the Supreme Court has stated that "[t]he arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate." *Gardner–Denver Co.*, 415 U.S. at 60, 94 S.Ct. at 1025 (footnote omitted) (effect of arbitration award on subsequent Title VII litigation). A sig-

nificant factor in determining the weight to be afforded an arbitration award is whether the "arbitral determination gives full consideration to an employee's" extra-contractual rights, particularly where the issue "is solely one of fact, specifically addressed by the parties and decided by the arbitrator on the basis of an adequate record." *Id.* at n. 21.

Here, the arbitrator's findings, which were before the EO and the IA, omit any mention of Henderson's retaliation claim. Moreover, the arbitrator could not have considered the Star Market employee notice clarifying the company's break-time policy that was posted *after* the Henderson arbitration hearing had ended. This evidence served to corroborate Henderson's retaliation claim. Without the benefit of this information, and given the lack of any findings with respect to Star Market's retaliatory behavior, it is clear to us that the arbitrator's factual inquiry and conclusions were incomplete. Thus, his findings were rightly refused conclusive effect in both the Election Rule protest proceedings and the subsequent enforcement proceedings held in the district court. *Cf. Nevins v. NLRB,* 796 F.2d 14, 18 (2d Cir.1986) (for NLRB to defer to an arbitration award in a related unfair labor practice dispute the "issues before the arbitrator [must] have been factually parallel to those before the NLRB and the arbitrator [must] have been presented generally with those facts relevant to disposing of the unfair labor practice charges").

Given the breadth of the undertaking contemplated by the Consent Decree, we believe that arbitrators are not well-suited to grapple with the problem of its enforcement. As has been borne out by the incessant litigation spawned by the government's attempt to enforce the Consent Decree, the Consent Decree has engendered a multiplicity of complex issues that may simply be beyond the "specialized competence" of most arbitrators. In an attempt to rid the IBT of its historic mob domination, an endeavor greatly beneficial to the public interest, the court-appointed officers have been charged with overseeing the organization and execution of a national un-

ion election. This has proven to be an arduous task, requiring extensive coordination of nation-wide activities. In anticipation of this, the Consent Decree established an entire institutional structure in order to secure its own implementation.

While certain aspects of these Consent Decree cases relate to the "law of the shop," their general import goes far beyond the provisions of any particular labor contract. We do not question the invaluable role that arbitrators serve in aid of smooth labor relations, and nothing we have stated herein should be construed as taking issue with the well established federal policy favoring arbitration of labor contract disputes. However, collective bargaining agreements and the Consent Decree address different problems and serve different purposes. The former governs the daily relations between particular employers and their employees, while the latter is an attempt to rebuild the infrastructure of an entire national labor organization. Considering these different objectives, we think it consistent with federal labor policy that where they differ, collective bargaining agreements yield to the Consent Decree, and that the Consent Decree officers and the district court remain free to complete their task unencumbered by collateral arbitration results. *Cf. Barrentine,* 450 U.S. at 739, 101 S.Ct. at 1444 (employee's action for wages under the Fair Labor Standards Act (FLSA) was not barred by prior submission of claim to contract grievance procedure since FLSA was designed to achieve specific goals not contemplated by the Labor–Management Relations Act). Therefore, we conclude that protest proceedings arising under the Consent Decree Election Rules are not preempted by binding arbitration.

## CONCLUSION

For the reasons stated above, we hold that the district court and its appointed officers afforded Star Market adequate procedural safeguards, and that Henderson's Election Rule protest was not preempted by the arbitration provision in his union collective bargaining agreement.

Accordingly, we affirm the district court's order enforcing the IA's decision and vacate the stay thereof.

Judgment affirmed; stay vacated.