**UNITED STATES of America, Plaintiff,**

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, et al., Defendants.**

**In re APPLICATION CVI OF the INDEPENDENT ADMINISTRATOR.**

**No. 88 Civ. 4486 (DNE).**

United States District Court, S.D. New York.

June 22, 1993.

Charles M. Carberry, Investigations Officer of Intern. Broth. of Teamsters (Celia A. Zahner, of counsel), for defendants.

Mary Jo White, U.S. Atty., S.D.N.Y. (Christine H. Chung, Asst. U.S. Atty., of counsel), for U.S.

Achtenberg & Achtenberg, P.C., Kansas City, MO (Irving Achtenberg, of counsel), for respondent Nicholas A. DiGirlamo.

## OPINION & ORDER

EDELSTEIN, District Judge:

This opinion emanates from the voluntary settlement of an action commenced by plaintiff United States of America (the "Government") against defendants International Brotherhood of Teamsters (the "IBT" or the "Union") and the IBT's General Executive Board (the "GEB") embodied in the voluntary consent order entered March 14, 1989 (the "Consent Decree"). The Consent Decree provides for three Court-appointed officials: the Independent Administrator to oversee the Consent Decree's remedial provisions, the Investigations Officer to bring charges against corrupt IBT members, and the Election Officer who supervised the electoral process that culminated in the 1991 election for International Officers. The goal of the Consent Decree is to rid the IBT of the influence of organized crime through the election and disciplinary provisions.

Application CVI presents for this Court's review the decision of the Independent Administrator finding that the Investigations Officer had proven that Nicholas A. DiGirlamo, bookkeeper for IBT Local 41 in Kansas City, Missouri and for IBT Joint Council 56, brought reproach upon the IBT by knowingly associating with members of the Kansas City La Cosa Nostra ("LCN").

## BACKGROUND

The Investigations Officer alleged that Mr. DiGirlamo violated Article II, Section 2(a) and Article XIX, Section 7(b) of the IBT Constitution by knowingly associating with

Charles Moretina ("C. Moretina"), James Moretina ("J. Moretina"), Peter Joseph Simone ("Simone") and Frank Anthony Tousa ("Tousa"), members of La Cosa Nostra. Article II, Section 2(a) is the IBT membership oath, which provides in relevant part that every IBT member shall "conduct himself or herself in a manner so as not to bring reproach upon the Union." Article XIX, Section 7(b) is a non-exhaustive list of disciplinary charges that may be filed against IBT members. Charges listed thereunder include violation of the IBT membership oath or the IBT Constitution, and knowing association with a member of a criminal organization. *See* Article XIX, §§ 7(b)(1), (2), (9).

■ Pursuant to paragraph F.12(C) of the Consent Decree, the Independent Administrator must decide disciplinary hearings using a "just cause" standard. The Investigations Officer has the burden of establishing just cause by a preponderance of the evidence. December 27, 1990 Opinion & Order, 754 F.Supp. 333, 337 (S.D.N.Y.1990). After receiving briefs from the parties to this action and conducting a hearing at which Mr. DiGirlamo was represented by counsel, the Independent Administrator issued a twenty-four page decision. The Independent Administrator found that the Investigations Officer had sustained his burden of proving that Mr. DiGirlamo had "knowingly associated" with C. Moretina, J. Moretina, Simone and Tousa.

As a penalty for this conduct, the Independent Administrator permanently banished Mr. DiGirlamo from the IBT, stating that "[a]n individual like DiGirlamo, who counts among his associates members of organized crime, has no place in the IBT." Ind.Admin.Dec. at 22. Furthermore, the Independent Administrator exercised his authority to impose sanctions upon Mr. DiGirlamo's employee benefits.[1] *See* December 28, 1990 Memorandum & Order, 753 F.Supp. 1181 (S.D.N.Y.1990), *aff'd,* 941 F.2d 1292 (2d Cir.), *cert denied,* —— U.S. ——, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991). The Independent Admin-

---

1. Consistent with prior rulings in this case, the Independent Administrator did not alienate Respondent's vested benefits.

istrator prohibited the IBT or any affiliate from contributing funds on Mr. DiGirlamo's behalf to any third-party plan of which Mr. DiGirlamo is a member.[2] Moreover, the Independent Administrator directed that the IBT or IBT-affiliated entities not make payment of any benefits to Mr. DiGirlamo. This prohibition includes such items as bonuses, local-controlled severance plans or similar payments. Finally, the Independent Administrator prohibited the IBT and IBT-affiliated entities from contributing to Mr. DiGirlamo's legal expenses in connection with the instant disciplinary action.

Mr. DiGirlamo appeals to this Court the decision of the Independent Administrator. In addition, Mr. DiGirlamo requests that this Court stay imposition of the penalties imposed by the Independent Administrator. This Court finds that the opinion of the Independent Administrator is fully supported by the evidence, and that Mr. DiGirlamo's arguments are devoid of merit. Accordingly, the opinion of the Independent Administrator is affirmed in its entirety. Furthermore, because Mr. DiGirlamo has failed to demonstrate that a stay of the imposition of penalties is appropriate, no stay will issue.

## DISCUSSION

In reviewing decisions of the Independent Administrator, it is well settled that the findings of the Independent Administrator "are entitled to great deference." *United States v. IBT*, 905 F.2d 610, 616 (2d Cir.1990), *aff'g* March 13, 1990 Opinion & Order, 743 F.Supp. 155 (S.D.N.Y.1990). This Court will overturn the findings of the Independent Administrator when it determines that they are, on the basis of all the evidence, "arbitrary or capricious." *United States v. IBT*, 964 F.2d 1308, 1311–12 (2d Cir.1992); August 27, 1990 Opinion & Order, 745 F.Supp. 908, 911 (S.D.N.Y.1990), *aff'd*, 941 F.2d 1292 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991); March 13, 1990 Opinion & Order, 743 F.Supp. 155, 165 (S.D.N.Y.1990), *aff'd*, 905 F.2d 610 (2d Cir.1990); *see* July 14, 1992 Opinion & Order, 803 F.Supp. 748, 754

(S.D.N.Y.1992); July 13, 1992 Opinion & Order, 803 F.Supp. 740, 745–46 (S.D.N.Y.1992); July 9, 1992 Opinion & Order, 803 F.Supp. 734, 737–38 (S.D.N.Y.1992); May 15, 1992 Opinion & Order, 792 F.Supp. 1346, 1352 (S.D.N.Y.1992); April 27, 1992 Memorandum & Order, 791 F.Supp. 421, 425 (S.D.N.Y.1992); February 11, 1992 Memorandum & Order, 787 F.Supp. 345, 350 (S.D.N.Y.1992); January 20, 1992 Memorandum & Order, 782 F.Supp. 256, 259 (S.D.N.Y.1992); January 16, 1992 Memorandum & Order, 782 F.Supp. 238, 241 (S.D.N.Y.1992); November 8, 1991 Memorandum & Order, *slip op.*, at 4–5, 1991 WL 243268 (S.D.N.Y.1991); October 29, 1991 Opinion & Order, 776 F.Supp. 144, 152–53 (S.D.N.Y.1991), *aff'd*, 954 F.2d 801 (2d Cir. 1992), *cert. denied*, —— U.S. ——, 112 S.Ct. 2993, 120 L.Ed.2d 870 (1992); October 25, 1991, Order, *slip op.*, at 4–5 (S.D.N.Y.1991); October 24, 1991 Memorandum & Order, 777 F.Supp. 1133, 1136 (S.D.N.Y.1991); October 16, 1991 Memorandum & Order, 777 F.Supp. 1130, 1132 (S.D.N.Y.1991), *aff'd*, 964 F.2d 1308 (2d Cir.1992); October 11, 1991 Memorandum & Order, 777 F.Supp. 1127, 1128 (S.D.N.Y.1991), *aff'd*, 956 F.2d 1161 (2d Cir. 1992); October 9, 1991 Memorandum & Order, 777 F.Supp. 1123, 1125 (S.D.N.Y.1991); August 14, 1991 Memorandum & Order, *slip op.*, at 4 1991 WL 161084 (S.D.N.Y.1991); July 31, 1991 Memorandum & Order, *slip op.*, at 3–4, 1991 WL 150226 (S.D.N.Y.1991), *aff'd*, 956 F.2d 1161 (2d Cir.1992); July 18, 1991 Memorandum & Order, *slip op.*, at 3–4, 1991 WL 136030 (S.D.N.Y.1991), *aff'd*, 956 F.2d 1161 (2d Cir.1992); July 16, 1991 Opinion & Order, *slip op.*, at 3–4, 1991 WL 136029 (S.D.N.Y.1991); June 6, 1991 Opinion & Order, 775 F.Supp. 90, 93 (S.D.N.Y.1991), *aff'd in relevant part*, 948 F.2d 1278 (2d Cir.1991); May 13, 1991 Memorandum & Order, 764 F.Supp. 817, 820–21 (S.D.N.Y.1991); May 9, 1991 Memorandum & Order, 764 F.Supp. 797, 800 (S.D.N.Y.1991) *aff'd*, 956 F.2d 1161 (2d Cir.1992); May 6, 1991 Opinion & Order, 764 F.Supp. 787, 789 (S.D.N.Y.), *aff'd*, 940 F.2d 648 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991); December 27, 1990 Opinion & Order, 754

---

2. Because Mr. DiGirlamo refused to submit to the Independent Administrator a schedule of his benefits or a memorandum on the issues raised in imposing sanctions touching upon those benefits, *see* Ind.Admin.Dec. at 23, this prohibition is couched in general terms.

F.Supp. 333, 337 (S.D.N.Y.1990); September 18, 1990 Opinion & Order, 745 F.Supp. 189, 191–92 (S.D.N.Y.1990); January 17, 1990 Opinion & Order, 728 F.Supp. 1032, 1045–57, *aff'd,* 907 F.2d 277 (2d Cir.1990).

### 1. *Admission of Hearsay Statements*

■ Mr. DiGirlamo argues that the Independent Administrator's decision was arbitrary and capricious because the Independent Administrator considered hearsay evidence in reaching his decision. However, it is beyond reasonable dispute that "hearsay evidence, if reliable, is admissible in IBT disciplinary proceedings." Oct. 16, 1991 Memorandum & Order, 777 F.Supp. 1130, 1133 (S.D.N.Y.1991) (*citing United States v. IBT,* 745 F.Supp. 908, 914–15 (S.D.N.Y.1990), *aff'd,* 941 F.2d 1292, 1297 (2d Cir.1991)). The Independent Administrator carefully considered the hearsay statements in the instant case and found them reliable in that they corroborated each other or were corroborated by independent and reliable sources. For example, while the Independent Administrator considered newspaper reports detailing various individuals' ties to organized crime, he did so only in those situations where several newspaper accounts corroborated each other *and* were corroborated by information from other sources. Moreover, Mr. DiGirlamo characterizes certain testimony as hearsay—such as that of FBI Special Agent Scott, *see Brief of Nicholas A. DiGirlamo in Opposition to the Decision of the Independent Administrator* ("Brief in Opposition") at 10—in spite of the fact that Special Agent Scott was available for cross-examination. After examining the hearsay evidence considered by the Independent Administrator, this Court finds that all such evidence considered was intrinsically reliable and was corroborated by independent and unrelated sources. Accordingly, this Court finds that the Independent Administrator's admission of hearsay statements does not render his decision arbitrary and capricious.

### 2. *Sufficient Evidence Supports the Independent Administrator's Finding That Respondent Knowingly Associated With Individuals Associated With the LCN*

Mr. DiGirlamo next argues that the Independent Administrator's decision was arbitrary and capricious because the evidence adduced at the disciplinary hearing did not show that Mr. DiGirlamo brought reproach on the Union by knowingly associating with members of organized crime. Mr. DiGirlamo presents a two-pronged attack on the Independent Administrator's decision. First, Respondent avers that insufficient evidence was adduced to demonstrate that C. Moretina, J. Moretina, Simone and Tousa are members of La Cosa Nostra. Second, Mr. DiGirlamo contends that any association that he had with C. Moretina, J. Moretina, Simone and Tousa was innocent or familial and therefore did not rise to the level of prohibited "knowing association." Respondent's argument is without merit. The evidence adduced at Mr. DiGirlamo's hearing amply supports the Independent Administrator's finding that Mr. DiGirlamo knowingly associated with these organized crime figures.

■ Prohibited knowing association with an organized crime figure is established when contact is purposeful and not incidental or fleeting. *See* Aug. 27, 1990 Opinion & Order, 745 F.Supp. 908, 918 (S.D.N.Y.1990), *aff'd,* 941 F.2d 1292 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1161, 117 L.Ed.2d 408 (1992). Purposeful contacts are prohibited even if no illegal purpose is demonstrated. *See* April 27, 1992 Memorandum & Order, 791 F.Supp. 421 (S.D.N.Y.1992). Purposeful contacts may occur in either a business or a social setting. *See* Aug. 27, 1990 Opinion & Order, 745 F.Supp. 908 (S.D.N.Y.1990). An examination of the record demonstrates that the Independent Administrator was well within his discretion in finding that Mr. DiGirlamo brought reproach upon the Union by knowingly associating with C. Moretina, J. Moretina, Simone and Tousa in violation of Article II, Section 2(a) and Article XIX, Section 7(b) of the IBT Constitution.

### A. *Charles Moretina, James J. Moretina, Peter Joseph Simone and Frank Anthony Tousa Are Members of the Kansas City LCN*

■ Evidence adduced in the course of Mr. DiGirlamo's disciplinary hearing before

the Independent Administrator conclusively linked C. Moretina, J. Moretina, Simone and Tousa to the Kansas City LCN. The testimony of FBI Special Agent Scott, and that of Fred Harvey Bonadonna, an FBI informant and a participant in the Federal Witness Protection Program, identified C. Moretina as a member of organized crime. *See* Ind.Admin.Dec. at 8. Various newspaper accounts corroborated this testimony. *See id.* Moreover, C. Moretina was convicted, and is currently serving a 20–year sentence, in connection with a Las Vegas casino skimming operation. *See United States v. DeLuna,* 763 F.2d 897 (8th Cir.1985). Several of C. Moretina's co-defendants in that case were members of organized crime. *See id.* Indeed, as Mr. DiGirlamo admitted in a post-hearing submission to the Independent Administrator, "[t]here is, admittedly, evidence upon which the Independent Administrator could find that Charles Moretina was a member of organized crime." Ind.Admin.Dec. at 9.

Special Agent Scott further testified that James Moretina is a member of the Kansas City LCN. *See id.* at 10. J. Moretina's automobile was observed by law enforcement officials at the funeral of a known member of organized crime, *see id.,* and in 1992 he pled guilty to laundering illegal gambling proceeds. *See id.* Numerous FBI confidential informants confirmed that J. Moretina is a member of organized crime. *See id.*

Moreover, the FBI and Mr. Bonadonna identified Simone as a member of the Kansas City LCN. In 1988, Simone was identified during Senate Subcommittee hearings as a "Capo" in a Kansas City organized crime family. *See id.* at 9. In addition, Simone's criminal record indicates that he has participated in illegal enterprises reputedly dominated by organized crime. In 1976, Mr. Simone was convicted of operating an interstate gambling operation. *See id.* at 10. In 1992, Simone pled guilty to a federal money laundering charge and to an unrelated charge of operating an illegal casino. *See id.* Numerous FBI confidential sources and

newspaper articles corroborated that Mr. Simone was a member of the Kansas City LCN. *See id.*

Finally, testimony at Mr. DiGirlamo's disciplinary hearing showed that the FBI considers Frank Anthony Tousa to be a member of the Kansas City LCN. In Senate Subcommittee testimony, Mr. Bonadonna identified Tousa as a member of the LCN who controls certain illegal gambling operations on behalf of the LCN. *See id.* at 11.[3] Substantial corroborative evidence, in the form of newspaper reports recounting Tousa's involvement with organized crime, was adduced before the Independent Administrator.

In sum, Mr. DiGirlamo's contention that the Independent Administrator's decision is arbitrary and capricious because the evidence did not demonstrate that C. Moretina, J. Moretina, Simone and Tousa are associated with the Kansas City LCN or an organized crime organization is wholly without merit.

B. *Mr. DiGirlamo's Contacts with Charles Moretina, James J. Moretina, Peter Joseph Simone and Frank Anthony Tousa Brought Reproach Upon the IBT*

■ Mr. DiGirlamo's argument that his contact with C. Moretina, J. Moretina, Simone and Tousa was innocent or familial, and thus beyond the purview of the relevant disciplinary provisions, is unavailing. First, a knowing and purposeful association between an IBT officer and a LCN figure cannot be deemed an "innocent" association. *See* May 9, 1991 Memorandum & Order, 764 F.Supp. 797 (S.D.N.Y.1991), *aff'd, United States v. IBT,* 956 F.2d 1161 (2d Cir.1992); *see also* April 27, 1992 Memorandum & Order, 791 F.Supp. 421 (S.D.N.Y.1992). More importantly, however, Mr. DiGirlamo's substantial contacts with C. Moretina, J. Moretina, Simone and Tousa, despite his awareness of their ties to organized crime, negates Mr.

---

**3.** It should also be noted that in 1977, Mr. DiGirlamo was convicted along with Tousa and Simone in connection with an illegal interstate gambling operation. As the Independent Administrator properly found, "[t]he fact that DiGirla-

mo was involved in illegal activities with these individuals in 1977 provides insight into the nature and duration of his associations." Ind.Admin.Dec. at 7.

DiGirlamo's contention that these relationships did not bring reproach upon the Union.

As an initial matter, Mr. DiGirlamo concedes that there exists evidence from which his knowledge of C. Moretina's ties to organized crime may be inferred. *See* Brief in Opposition at 13 ("In view of DiGirlamo's knowledge of [Charles Moretina's] conviction in 1983 for casino skimming we do not argue that [Mr. DiGirlamo] had no knowledge of Charles Moretina's underworld ties."); *see also Post–Hearing Memorandum of Nicholas A. DiGirlamo to the Independent Administrator* at 12 (conceding that, based upon the evidence adduced, the Independent Administrator could find that Mr. DiGirlamo knew of C. Moretina's ties to the LCN). As the Independent Administrator properly found, "[g]iven DiGirlamo's close relationship with C. Moretina, it would be inconceivable that DiGirlamo would not know of [C. Moretina's] organized crime connections." *See* Ind.Admin.Dec. at 17. However, rather than avoiding contact with C. Moretina, Mr. DiGirlamo encouraged a close relationship. For example, Mr. DiGirlamo's car was observed by the FBI outside of C. Moretina's house during working hours. *See id.* at 13–14. Moreover, Mr. DiGirlamo attended C. Moretina's federal criminal trial, and subsequently visited him several times in prison. *See id.* at 14; *see also* Brief in Opposition at 15 ("DiGirlamo visited [C. Moretina] four or five times while he was incarcerated in a federal prison."). Thus, it is clear that Mr. DiGirlamo freely associated with C. Moretina, who Respondent knew to have ties to the Kansas City LCN. Therefore, the Independent Administrator's finding that this conduct brought reproach upon the IBT is not arbitrary or capricious.

Furthermore, "[a]s with C. Moretina, it would be inconceivable for DiGirlamo not to have known of J. Moretina's organized crime ties given the nature of his relationship to him." *See* Ind.Admin.Dec. at 19. Nevertheless, Mr. DiGirlamo knowingly associated with J. Moretina. In 1978, J. Moretina

helped Mr. DiGirlamo find employment. *See id.* at 14. In 1985, J. Moretina, along with Peter Simone, hired DiGirlamo as accountant for the Be Amused Vending and Amusement Company ("Be Amused").[4] *See id.* In this capacity, Mr. DiGirlamo had daily contact with J. Moretina, visited his house, and frequently spoke to him on the telephone. *See id.* In light of their close relationship, and the fact that Mr. DiGirlamo must have been aware of J. Moretina's ties to organized crime, the Independent Administrator's finding that this knowing association brought reproach upon the IBT is not arbitrary and capricious.

Moreover, Mr. DiGirlamo has had substantial contact with Peter Joseph Simone and, in light of their long relationship, must have known of Simone's ties to the underworld. Mr. DiGirlamo and Simone have known each other since grade school. *See id.* at 20. They have remained in frequent contact over the years: together they participate in community-based sporting activities, and their daughters are close friends. *See id.* at 20. Over the years, Simone and Mr. DiGirlamo frequently visited each other's homes. *See id.* Finally, Mr. DiGirlamo admits that he occasionally went to Simone's illegal gambling hall to pick up "Be Amused's" books, and conversed with Simone while there. *See id.* at 21. Therefore, Mr. DiGirlamo clearly encouraged a close association with Mr. Simone and it defies credulity to believe, in this context, that Mr. DiGirlamo was unaware of Simone's criminal activities. As such, the Independent Administrator's finding that Mr. DiGirlamo brought reproach on the IBT by knowingly associating with Simone is not arbitrary or capricious.

Finally, Mr. DiGirlamo's knowing association with Frank Anthony Tousa is well established in the record. Mr. DiGirlamo has admitted that he read newspaper articles discussing Tousa's ties to the Kansas City underworld. *See id.* at 22. Nevertheless, Mr. DiGirlamo prepared Tousa's and his

4. While Mr. DiGirlamo was working for "Be Amused," the FBI seized illegal gambling apparatus owned by "Be Amused." *See* Ind.Admin.Dec. at 4. Although Mr. DiGirlamo was not indicted in connection with this matter, J. Moretina, Simone and several other "Be Amused" employees were convicted on charges of participating in a money laundering and illegal gambling scheme. *See id.* at 4–5.

wife's personal income tax returns. *See id.* In connection with this work, Mr. DiGirlamo spent time at Tousa's home. *See id.* Given this contact, and substantial evidence that Mr. DiGirlamo was aware of Tousa's criminal activities, the Independent Administrator's finding that Mr. DiGirlamo brought reproach on the IBT by knowingly associating with Tousa is not arbitrary or capricious.

In sum, therefore, evidence adduced before the Independent Administrator established that C. Moretina, J. Moretina, Simone and Tousa were members of the Kansas City La Cosa Nostra. Moreover, Mr. DiGirlamo's associations with these men were purposeful and not incidental or fleeting. The evidence established that Mr. DiGirlamo engaged in long-term relationships with these men in spite of the fact that he was aware of their ties to organized crime. Despite Mr. DiGirlamo's protestations to the contrary, such behavior is antithetical to any standard of appropriate conduct for a Union official. Indeed, it is such conduct that has allowed organized crime to fester within the IBT. Accordingly, the Independent Administrator's findings were neither arbitrary nor capricious and the Independent Administrator's decision is therefore affirmed.

3. *Respondent's Unauthorized "Supplemental Memorandum in Opposition to the Decision of the Independent Administrator"*

Although Respondent's counsel was advised that this Court does not accept reply briefs in connection with IBT disciplinary matters, Respondent nevertheless filed a "Supplemental Memorandum in Opposition to the Decision of the Independent Administrator," dated March 4, 1993. Counsel has been advised by telephone that submission of this unauthorized "Supplemental Memorandum" was improper. Furthermore, because the arguments contained in this memorandum are raised therein for the first time, these arguments are not properly the subject of a reply memorandum.

Nonetheless, this Court has taken a look at the arguments contained therein. Succinctly stated, Respondent takes the patently frivolous position that the disciplinary action against Respondent violated his due process rights. In making such an argument, Respondent's counsel has overlooked a substantial body of precedent.

Respondent received a fair hearing as required by the Consent Decree. The disciplinary charge against Mr. DiGirlamo was sufficiently specific to withstand scrutiny. Similar charges filed under the Consent Decree repeatedly have been found to be sufficiently specific and within the requirements of the Labor–Management Reporting and Disclosure Act ("LMRDA"). *See, e.g., United States v. IBT*, 964 F.2d 1308, 1310 (2d Cir.1992); *United States v. IBT*, 941 F.2d 1292, 1294–95 (2d Cir.1991), *cert. denied*, — U.S. ——, 112 S.Ct. 1161, 117 L.Ed.2d 408 (1992); May 9, 1991 Memorandum & Order, 764 F.Supp. 797, 800–01 (S.D.N.Y.1991), *aff'd, United States v. IBT*, 956 F.2d 1161 (2d Cir.1992). Moreover, contrary to Respondents' assertion, the provisions of the IBT Constitution that Mr. DiGirlamo was charged with violating are not unconstitutionally vague. *See United States v. IBT*, 941 F.2d 1292, 1298 (2d Cir.1991), *cert. denied*, — U.S. ——, 112 S.Ct. 1161, 117 L.Ed.2d 408 (1992) ("[B]ecause it should have been clear to [Respondents] that associating with known members of organized crime would bring reproach upon the IBT, sanctioning them for these activities is not constitutionally infirm.").

Respondent's remaining constitutional arguments are similarly without merit. Perhaps if Respondent's counsel had conducted some rudimentary legal research, Respondent would have been deterred form burdening this Court with such untenable arguments. It is now well settled that the Independent Administrator is not a state actor and his conduct in connection with disciplinary proceedings does not constitute state action. *See United States v. IBT*, 941 F.2d 1292, 1295–98 (2d Cir.), *cert. denied*, — U.S. ——, 112 S.Ct. 1161, 117 L.Ed.2d 408 (1992); *see also United States v. IBT*, 954 F.2d 801, 806–07 (2d Cir.1992); *United States v. IBT*, 981 F.2d 1362, 1371 (2d Cir.1992). As such, Respondent's due process, and other constitutional arguments, must fail.

In any event, Respondent received a fair and impartial hearing before the Independent Administrator, a former federal judge. Mr. DiGirlamo was represented by counsel, submitted written briefs to the Independent Administrator, and was given the opportunity to, and did, cross-examine adverse witnesses. All evidence against Respondent that was introduced at the disciplinary hearing was given to him in advance of the hearing. Mr. DiGirlamo testified in his own behalf and called witnesses in his defense. After carefully considering all the evidence, the Independent Administrator issued a written opinion. As such, the disciplinary action against Respondent complied with the Consent Decree and all applicable law.

Finally, the disciplinary action against Respondent did not violate the LMRDA's free speech provisions. *See* 29 U.S.C. § 411(a)(2). As Respondent's counsel should have learned in the course of conducting legal research on his client's behalf, this Court has held that "[t]he IBT's sanctioning members in order to rid itself of corrupt influence conforms with § 101(a)(2) of the LMRDA, and infringes no First Amendment rights." Aug. 27, 1990 Opinion & Order, 745 F.Supp. 908, 913 (S.D.N.Y.1990), *aff'd*, 941 F.2d 1292 (2d Cir. 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1161, 117 L.Ed.2d 408 (1992). Thus, this argument is without merit.

### 4. *The Penalty*

█ Respondent's final argument, contained in his Brief in Opposition, is that the penalty imposed on Mr. DiGirlamo by the Independent Administrator is arbitrary and capricious because it is "far more harsh than that imposed in far more grievous cases." Brief in Opposition at 46. This argument is without merit. The Independent Administrator carefully considered Mr. DiGirlamo's participation in the charged offense as well as factors in mitigation of punishment. Mr. DiGirlamo's belief that the sanctions imposed are "harsh" does not make the Independent Administrator's decision arbitrary or capricious. *See United States v. IBT*, 981 F.2d 1362, 1371–2 (2d Cir.1992).

Both this Court and the Second Circuit have held that the Independent Administra-

tor, who presides over disciplinary hearings pursuant to the Consent Decree, is best situated to determine and fix the penalty to be imposed upon IBT members who violate the Consent Decree's disciplinary provisions. *See United States v. IBT*, 978 F.2d 68, 74 (2d Cir.1992). In doing so, he is entitled to great deference. *See United States v. IBT*, 981 F.2d at 1372; *United States v. IBT*, 978 F.2d at 74; March 5, 1993 Opinion & Order, 817 F.Supp. 337, 347 (S.D.N.Y.1993). This is a matter of critical importance. The Independent Administrator conducts the hearings and thus is best equipped to evaluate the demeanor, credibility and, ultimately, the culpability, of those who appear before him. *See id.*; Feb. 9. 1993 Opinion & Order, 814 F.Supp. 1165, 1178 (S.D.N.Y.1993). It follows that he is also uniquely situated to choose an appropriate penalty. *See* June 10, 1993 Memorandum & Order, 824 F.Supp. 406, 409 (S.D.N.Y.1993); March 5, 1993 Opinion & Order, 817 F.Supp. 337, 347. As the Second Circuit has stated, "[t]he experienced independent administrator—himself a former federal district judge—heard the witnesses and fixed a penalty. On this record there is no basis for finding the penalty chosen by the administrator was either arbitrary or capricious." *United States v. IBT*, 978 F.2d at 74.

An example of the Independent Administrator's great discretion in determining an appropriate penalty is found in *United States v. IBT* ("*Sansone*"), 981 F.2d at 1371–2. In *Sansone*, the Second Circuit refused to overturn the Independent Administrator's decision to permanently bar the President of IBT Local 682, Robert S. Sansone, from holding Union office, even though the Court of Appeals indicated that it might have reached a different result. *See id.* at 1372. As the Second Circuit stated, "the apparent discrepancy between the penalty imposed here and those imposed in other cases does not inexorably compel the conclusion that the Independent Administrator acted arbitrarily or capriciously." *Id.*

Finally, no discrepancy exists between the penalty imposed here and that imposed in prior cases involving analogous conduct. *See, e.g.,* July 13, 1992 Opinion & Order, 803

F.Supp. 740, 741 (S.D.N.Y.1992) (IBT officer permanently banished from the Union for failing to investigate allegations that fellow officers were members of the LCN). Many other IBT members found to have knowingly associated with LCN members have been permanently banished from the Union. *See, e.g.,* April 27, 1992 Memorandum & Order, 791 F.Supp. 421, 423 (S.D.N.Y.1992) (IBT member permanently banished for knowingly associating with LCN member); January 16, 1992 Memorandum & Order, 782 F.Supp. 238, 240 (S.D.N.Y.1992) (same); October 16, 1991 Memorandum & Order, 777 F.Supp. 1130, 1131 (S.D.N.Y.1991) (same). The Independent Administrator's decision to impose this penalty on Mr. DiGirlamo is well supported by the record in this disciplinary action.

Thus, Respondent's claim that the penalties imposed in the instant matter are arbitrary and capricious because they are "severe" or "harsh" is unpersuasive. The Independent Administrator carefully considered the evidence presented. In light of the seriousness of Mr. DiGirlamo's wrongdoing, the penalty fixed by the Independent Administrator was appropriate and was not arbitrary or capricious.

5. *Respondent's Application for A Stay*

Mr. DiGirlamo requests that this Court stay imposition of the penalties imposed by the Independent Administrator. The factors regulating the issuance of a stay are:

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether the issuance of a stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Hilton v. Braunskill,* 481 U.S. 770, 776, 107 S.Ct. 2113, 2119, 95 L.Ed.2d 724 (1987). Applying these criteria to the instant application, I find that a stay is not appropriate.

First, Mr. DiGirlamo has not made a strong showing that he is likely to succeed on the merits. This Court and the Independent Administrator have found that Mr. DiGirla-

mo committed the charged conduct and that this conduct merits severe disciplinary sanctions. After lengthy analysis in written opinions, both the Independent Administrator and this Court have concluded that Respondent's arguments are without merit. Thus, Mr. DiGirlamo cannot be considered likely to achieve success on the merits.

Second, I find that Mr. DiGirlamo will not suffer irreparable harm from the denial of a stay. Indeed, Respondent does not even contend that any injury that he might suffer is "irreparable." Rather, Respondent claims that he will suffer "injury" absent a stay because "[h]is employment by the union is the main source of his income. He is now unemployed." Brief in Opposition at 53. This purported injury does not rise to the level of irreparable harm. Even if Respondent succeeds on appeal, an award of back pay would redress any injury to Mr. DiGirlamo: "Irreparable injury is one that cannot be addressed through a monetary award. [Thus,] where money damages are adequate compensation [injunctive relief] should not issue." *JSG Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir.1990); *see Johnpoll v. Thornburgh,* 898 F.2d 849, 851 (2d Cir.), *cert. denied,* 498 U.S. 819, 111 S.Ct. 63, 112 L.Ed.2d 38 (1990); *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 974–75 (2d Cir.1989). In addition, permanent banishment from the IBT is remedied by reinstatement in the IBT should Mr. DiGirlamo prevail on appeal. Therefore, Mr. DiGirlamo has failed to allege that type of injury necessary to support the issuance of a stay.

Third, any injury to Mr. DiGirlamo is outweighed by the potential harm to the Union should Mr. DiGirlamo be permitted to retain IBT membership pending appeal. The Independent Administrator and this Court have found that Mr. DiGirlamo knowingly associated with persons tied to the Kansas City LCN. Historically, conduct of this type allowed organized crime to gain a foothold in, and ultimately to corrupt, the IBT. *See United States v. IBT,* 981 F.2d at 1372 ("[T]his case involves the IBT and its crimson record of corruption ... [one goal of the Independent Administrator is] to maintain the institutional integrity of the Union and to

dissipate a climate where union officials acquiesce in the criminal exploits of their colleagues.). Knowing association is particularly insidious because such conduct often has allowed La Cosa Nostra and other criminal organizations to quietly corrupt an otherwise legitimate labor organization. I find that Respondent has failed to demonstrate that the issuance of a stay will not injure other parties interested in these proceedings.

Finally, the public interest would not be furthered by the issuance of a stay. The public interest lies in the maintenance of a Union that serves the needs, and advocates the interests, of its members. The public interest is furthered by actions that help the IBT to expeditiously eradicate from its ranks the scourge of organized crime. Those members of the IBT, such as Mr. DiGirlamo, who knowingly associate with members of the LCN bring reproach upon the Union and allow the taint of organized crime to attach to the IBT. It is clearly not in the public interest to delay removal from the IBT of persons who are found to have knowingly associated with members of organized crime. Thus, Mr. DiGirlamo's application for a stay must be denied.

## CONCLUSION

IT IS HEREBY ORDERED that Respondent's objections to the Independent Administrator's decision are DENIED; and

IT IS FURTHER ORDERED that the decision of the Independent Administrator is AFFIRMED in its entirety; and

IT IS FURTHER ORDERED that Respondent's application for a stay is DENIED.

SO ORDERED.